**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 11 C 4175** |
| | ) | |
| **ALL FUNDS ON DEPOSIT WITH R.J.** | ) | |
| **O'BRIEN & ASSOCIATES, HELD IN THE** | ) | |
| **NAME OF BRIDGE INVESTMENT, S.L.,** | ) | |
| **BEARING ACCOUNT NUMBERS** | ) | |
| **XX-X3931 AND XXX-X1784, MAINTAINED** | ) | |
| **AT HARRIS BANK, ACCOUNT NUMBER** | ) | |
| **XXX-171-6,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| ----------------------------------------------------------- | ) | |
| | ) | |
| **ART INSURANCE COMPANY, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 12 C 1346** |
| | ) | |
| **AL QAEDA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

The United States filed an *in rem* action (Case No. 11 C 4175) seeking forfeiture

of approximately $6,600,000 held in futures trading accounts. It contends that the

money is the property of an affiliate of the Al Qaeda terrorist organization. A number of

insurance companies that paid property damage claims arising from the September 11,

2001 terrorist attacks filed claims to the funds and answers to the government's complaint.  In addition, a group of individuals asserting personal injury and wrongful death claims arising from the September 11 attacks moved to intervene and filed an answer to the government's complaint.  On March 27, 2012, the Court granted the government's motions to strike the insurance company claimants' claims and answers and denied the personal injury claimants' motion to intervene.  *United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, No. 11 C 4175, 2012 WL 1032904, at *1 (N.D. Ill. March 27, 2012).

The insurance company claimants have moved to file amended claims and answers.  The government opposes the motion.  The insurance company claimants separately registered in this district a judgment they had obtained in the Southern District of New York (Case No. 12 C 1346 in this district).  They then sought a writ of execution and served the United States Marshal with a citation to discover assets.  The government has moved to quash the writ of execution and the citation.

For the reasons discussed below, the Court denies the government's motion to quash and grants claimants' motion to amend.

### Background

The present decision assumes familiarity with the Court's March 27, 2012 decision striking the claimants' answers and claims.

A.     **The defendant property**

In 2003, a commodities futures trading account was opened at R.J. O'Brien & Associates (RJO) in the name of Bridge Investment, S.L., a Spanish corporation.  In 2005, Mohammad Qasim al Ghamdi (Al Ghamdi), who was identified as Bridge

Investment's general manager, took control of the trading account. Between June and September 2005, he deposited almost $24,000,000 in the account. The account lost money, and by May 2006 only about $6,600,000 remained. Later in 2006, Bridge Investment opened a second account with RJO but did not deposit any additional money into the account.

The government alleges that the money Al Ghamdi deposited in the RJO account was the property of Muhammad Abdallah Abdan Al Ghamdi, also known as Abu al Tayyeb (Al Tayyeb), a member of Al Qaeda and an associate of Al Ghamdi. The government alleges that Al Tayyeb raised money in Saudi Arabia and used it to support Al Qaeda's activity. He provided approximately $35 million to Al Ghamdi, and it was a portion of this money that Al Ghamdi deposited in the RJO account. Saudi Arabian authorities arrested Al Tayyeb in June 2006. At the time, he had been planning or considering several different types of terrorist attacks on Saudi Arabia and the United States.

In June 2007, the United States Department of the Treasury's Office of Foreign Assets Control, using its authority under the International Emergency Economic Powers Act (IEEPA), blocked Bridge Investment's two accounts at RJO. The funds in the accounts remained blocked when the government initiated this forfeiture action on June 19, 2011. In this action, the government claims that the funds were forfeit as the assets of an individual or entity planning or perpetrating an act of terrorism against the United States or a foreign government in violation of 18 U.S.C. § 981(a)(1)(G)(I) and (iv). Following the filing of the complaint, the Court issued an *in rem* arrest warrant for the funds, and federal law enforcement agents then seized the funds. The United States

Marshal has held the funds since July 15, 2011, placing them in a seized asset deposit fund.

**B.    The claimants**

The claimants are twelve insurance companies:  One Beacon Insurance Group, American Alternative Insurance Company, The Princeton Excess & Surplus Lines Insurance Company, Great Lakes UK Insurance Company, Vigilant Insurance Company, Chubb Custom Insurance Company, Chubb Indemnity Insurance Company, Federal Insurance Company, Chubb Insurance Company of New Jersey, Chubb Insurance Company of Canada, Pacific Indemnity Company, and Great Northern Insurance Company.   Claimants collectively paid more than $2.5 billion in property damage and business interruption claims arising from the September 11 terrorist attacks.  In 2003, they and other similarly situated insurance companies filed suit against Al Qaeda and other defendants in the United States District Court for the Southern District of New York seeking to recover the funds they had paid out.  Their case was consolidated with personal injury and wrongful death claims that a group of several thousand individuals injured or killed in the September 11 attacks filed against Al Qaeda and other defendants in 2002.

In April 2006, the district court in New York entered orders of default against the defendants because they had not answered the complaint.   In 2007, the insurance companies moved the court to assess damages in the total amount of more than $9.4 billion in favor of all the insurance company plaintiffs, including some plaintiffs who are not claimants here.

The district court, however, took no action on the insurance companies' motion

4

for around four years.  On July 13, 2011, the district court referred the motion to a magistrate judge.  Consequently, when claimants filed their initial claims and answers in this forfeiture action in August and September 2011, they were able to say only that the New York federal court had determined liability in their favor, and they were unable to specify the amount of their claim.

In October 2011, the magistrate judge in New York recommended awarding the insurance companies the judgment they sought, with only minor subtractions.  The district court adopted the recommendation fully and entered judgment in favor of the insurance companies on December 22, 2011.  On January 25, 2012, the district court in New York determined that there was no reason for delay and issued final judgments in favor of the insurance companies even though other portions of the consolidated cases were ongoing.  The present insurance claimants' share of the judgment amounts to more than $7.5 billion.

On December 5, 2011, the government sought to strike claimants' claims and answers, contending that they did not have standing to assert their claims.  On January 27, 2012, claimants sought leave to file amended claims and answers that would reflect their final judgment.

On March 27, 2012, the Court granted the government's motion to strike and denied claimants' motion to amend.  The Court concluded that even with the final judgment, claimants were unsecured creditors who lacked an interest in the specific property that was the subject of the forfeiture action, as the civil forfeiture statute and Federal Rules of Civil Procedure require.  *See* 18 U.S.C. § 983(a)(2)(C)(ii); Fed. R. Civ. P., Supp. R. G(5)(a)(i)(B).  Accordingly, claimants lacked prudential and statutory

standing to make a claim. *See United States v. $500,000.00*, 591 F.3d 402, 404 (5th Cir. 2009)*; United States v. One-Sixth Share of James J. Bulger in All Present and Future Proceeds of Mass Millions Lottery Ticket No. M246233*, 326 F.3d 36, 44 (1st Cir. 2003)*.

On February 27, 2012, claimants registered their judgment from the New York district court in this district. That matter was originally assigned to Judge Gettleman as Case No. 12 C 1346. Claimants served a citation to discover assets on the United States Marshal on April 10, 2012, and they obtained a writ of execution ordering the marshal to execute on the defendant funds. *See* 735 ILCS 5/2-1402(a) & (m). On April 13, Case No. 12 C 1346 was transferred to this Court as a related case to the forfeiture action.

## Discussion

Claimants contend that by service of the citation to discover assets, they have established a lien on the defendant funds and now have the requisite interest in the funds to assert a claim in the forfeiture proceeding. The government disagrees and moves to quash claimants' citation and writ of execution.

**A.     Motion to quash**

The government contends that the citation and writ violate the sovereign immunity of the United States and the doctrines of prior exclusive jurisdiction and *in custodia legis*.

**1.     Sovereign immunity**

"[S]overeign immunity bars creditors from attaching or garnishing funds in the Treasury, or enforcing liens against property owned by the United States." *Dep't of the*

*Army v. Blue Fox*, 525 U.S. 255, 264 (1999) (citation omitted).  The government contends that claimants' citation and writ of execution violate its sovereign immunity because the defendant funds have been seized by the government and are in the possession of the United States Marshal.  The Court concludes, however, that Congress waived the government's sovereign immunity through the Terrorism Risk Insurance Act (TRIA).

The TRIA provides:

Notwithstanding any other provision of law, . . . in every case in which a person has obtained a judgment against a terrorist party based upon an act of terrorism, . . . the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

Terrorism Risk Insurance Act of 2002 § 201(a), 116 Stat. 2322, 2337 (codified at 28 U.S.C. § 1610 note).  The TRIA defines blocked assets as "any asset seized or frozen by the United States under" the Trading with the Enemy Act or the IEEPA.  *Id.* § 201(d)(2).  The President has the power to waive the execution provision of the TRIA, but only "on an asset-by-asset basis" and only when waiver "is necessary in the national security interest."  *Id.* § 201(b)(1).

It is undisputed that claimants have a judgment against Al Qaeda for a claim based upon an act of terrorism.  It is also undisputed that the defendant funds were blocked assets, although, as will be discussed below, the government contends that the assets are now the property of the United States.  The government contends that the funds were the property of Al Tayyeb, not Al Qaeda, and that as a result the TRIA does not apply because claimants' judgment is against Al Qaeda, not Al Tayyeb.  The

7

forfeiture complaint, however, states that Al Tayyeb is a member of Al Qaeda who has raised money in Saudi Arabia to support Al Qaeda. Compl. ¶ 13, 18. The complaint also states that the defendant funds were part of the money Al Tayyeb raised in Saudi Arabia and that he used other funds raised at the same time to fund violent jihadist activities. *Id.* ¶ 18. At the time that he was arrested in Saudi Arabia, Al Tayyeb was considering or planning several terrorist attacks, including attacks for the purpose of obtaining the release of Al Qaeda operatives. *Id.* ¶ 21. Given these facts, Al Tayyeb could have been acting as an agent or instrumentality of Al Qaeda when he raised the defendant funds. Thus, claimants can invoke the provisions of the TRIA in their efforts to execute on the defendant funds.

The government contends that the TRIA does not waive the sovereign immunity of the United States. It notes that "a waiver of sovereign immunity is to be strictly construed, in terms of its scope, in favor of the sovereign. Such a waiver must also be unequivocally expressed in the statutory text." *Dep't of the Army v. Blue Fox*, 525 U.S. 255, 261 (1999) (citations and internal quotation marks omitted). To waive sovereign immunity, however, "Congress need not state its intent in any particular way. [The Supreme Court has] never required that Congress use magic words." *FAA v. Cooper*, 132 S. Ct. 1441, 1448 (2012). The TRIA states that persons holding a judgment against a terrorist party are able to execute against blocked assets "notwithstanding any other provision of law." TRIA § 201(a). Blocked assets are defined as those seized or frozen by the government. The TRIA specifically permits a judgment creditor to execute on such assets. Thus if the statute does not waive the government's sovereign immunity, it is effectively meaningless in this regard. In short, when Congress adopted a statute

stating that judgment creditors could execute against blocked assets notwithstanding any other provision of law, it unequivocally waived the government's sovereign immunity.

Courts have also noted that Congress's purpose in adopting the TRIA was to provide a comprehensive way for victims of terrorism to enforce their judgments and eliminate efforts by the executive branch to hinder execution by judgment holders. *See Smith v. Fed. Reserve Bank of New York*, 346 F.3d 264, 271–72 & n.7 (2d Cir. 2003) (quoting a senator's statement that the TRIA "establishes once and for all, that *such judgments are to be enforced* against any assets *available* in the U.S., and that the executive branch has no statutory authority to *defeat such enforcement under standard judicial processes*" (emphasis in original)); *Levin v. Bank of New York*, No. 09 CV 5900 RPP, 2011 WL 812032, at *16–17 (S.D.N.Y. Mar. 4, 2011); *Weininger v. Castro*, 462 F. Supp. 2d 457, 483 (S.D.N.Y. 2006). This reinforces the conclusion, already apparent from the plain language of the TRIA, that the statute waives the government's sovereign immunity.

The government contends that the Court should adopt the reasoning of *Weinstein v. Islamic Republic of Iran*, 274 F. Supp. 2d 53 (D.D.C. 2003), in which the court held that the language of the TRIA was susceptible to more than one meaning and thus did not unequivocally waive sovereign immunity. *Id.* at 58. Specifically, the court stated that the provision of the TRIA defining blocked assets as assets seized by the United States could refer merely to assets that had once been seized by the government but had since been released. *Id.* at 57. That definition of assets seized by the United States would not entail a waiver of sovereign immunity, because such assets

would no longer be in the possession of the United States. *Id.* at 57.

The Court respectfully disagrees with *Weinstein*. The only reasonable reading of the statute's reference to seized assets is that they are assets that the government has seized and over which it still exercises control. This is particularly the case given Congress's intent, in adopting the TRIA, to prevent executive branch interference with terrorist victims' collection of their judgments. Indeed, the District of Columbia Circuit effectively has disavowed the *Weinstein* court's reasoning, albeit without citing to the decision. Specifically, in *Bennett v. Islamic Republic of Iran*, 618 F.3d 19 (D.C. Cir. 2010), the court stated that the "TRIA's provisions apply only to property possessed by the United States." *Id.* at 23.

The government also contends that the TRIA is ambiguous because it is not clear that it applies to "*previously* frozen assets that are subsequently seized or confiscated by the government pursuant to some other provision of law." Gov. Reply at 6 (emphasis in original). The assets here, however, are (at least according to the government's complaint) still blocked under the IEEPA. Compl. ¶ 23. The Second Circuit has ruled that judgment holders cannot use the TRIA to reach funds confiscated by the United States under the IEEPA. *Smith*, 346 F.3d at 271–72. The court in *Smith* noted that confiscation vested title to the funds in the United States, so that no blocked funds existed to which the TRIA could apply. *Id.* at 272. The court held that judgment creditors could not subsequently use the TRIA to execute against the already confiscated assets, because "[the TRIA] imposes no obligation on the President to maintain such funds for future attachment." *Id.* at 271. Even if *Smith*'s holding regarding the effects of confiscation under the IEEPA is equally persuasive in the civil

forfeiture context, the situation here is distinguishable.  In *Smith*, the government

confiscated the funds and took title to them "well before Plaintiffs had obtained a final

judgment."  *Id.* at 272.  Here, by contrast, the government's forfeiture proceeding is

ongoing, and the defendant funds remain as blocked funds.

In sum, the government cannot quash claimants' writ of execution or citation on

the basis of sovereign immunity.

### 2.        Prior exclusive jurisdiction and *in custodia legis*

The government also contends that claimants' writ of execution and their citation

to discover assets should be quashed because claimants' actions in obtaining them

violated the doctrines of prior exclusive jurisdiction and *in custodia legis*.  These similar

doctrines hold that "the first court to obtain in rem jurisdiction has exclusive jurisdiction

of the res."  *United States v. Howell*, 354 F.3d 693, 695 (7th Cir. 2004); *see United

States v. $79,123.49 in United States Cash & Currency*, 830 F.2d 94, 97 (7th Cir. 1987)

(discussing prior exclusive jurisdiction); *De Korwin v. First Nat'l Bank*, 267 F.2d 337, 339

(7th Cir. 1959) (discussing *in custodia legis*).  The government contends the claimants'

actions in obtaining the writ and citation violated these doctrines, because they

attempted to have another judge of this court exercise jurisdiction over the defendant

funds.

Section 201 of the TRIA, however, gives claimants the ability to execute or attach

blocked assets notwithstanding any other provision of law.  The statue's reference to

"any other provision of law" encompasses common law doctrines that counsel against

two courts exercising jurisdiction over the same property.  *See $79,123.49*, 830 F.2d at

99 (suggesting that doctrine of prior exclusive jurisdiction can be superseded by federal

statute). As the Supreme Court has noted, courts "generally have interpreted . . . notwithstanding language to supersede all other laws, stating that a clearer statement is difficult to imagine." *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18 (1993) (internal quotation marks and ellipses in original omitted); *see Bennett*, 618 F.3d at 23 (due to notwithstanding provision, TRIA is not limited by conflicting laws); *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 53 (2d Cir. 2010) (to the degree that treaty conflicts with TRIA, TRIA provisions must prevail because of notwithstanding provision). Moreover, even though claimants' writ and citation were issued by Judge Gettleman, the case is now before this Court. The government has not argued that, if the writ and citation were quashed, the doctrines of prior exclusive jurisdiction and *in custodia legis* would prevent claimants from immediately obtaining a new writ and citation from this Court.

The government contends that the notwithstanding language in the TRIA must have some limits. It argues that the Supreme Court has stated that the history of the TRIA "suggests that Congress placed the notwithstanding clause in § 201(a) . . . to eliminate the effect of any Presidential waiver issued . . . prior to the date of TRIA's enactment." *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 386 (2009). Accordingly, the government contends that the TRIA should be limited to overriding statutory provisions that relate to the legislative history the Court discerned. The Supreme Court, however, was not suggesting that the plain language of the TRIA should be restricted by legislative history of the statute. Instead, it was noting that one of the party's legislative history argument was incorrect. *Id.* The Court held in *Elahi* that the TRIA's notwithstanding language had limits. The limits it imposed, however, were that the notwithstanding provision could not overcome

other provisions of the TRIA that had been enacted at the same time as the notwithstanding language. *Id.* at 385–86. That does not help the government in this case.

The government also contends that claimants are attempting to use their writ of execution and citation to bypass this forfeiture proceeding improperly. Regardless of whether the provisions of the TRIA might allow claimants to do so, that is not what they are attempting. Claimants initially sought to participate in the forfeiture proceeding, filing claims and answers with the Court. On the government's motion, the Court struck their claims and answers, noting that they needed to serve a citation to discover assets in order to have the requisite interest in the defendant funds. Claimants then served a citation to discover assets and are now seeking to amend their claims and answers so that they may participate in the forfeiture proceeding. Claimants have sought to use the provisions of the TRIA to take part in the forfeiture proceeding, not bypass it.

For these reasons, the Court denies the government's motion to quash.

**B.** **Motion to amend**

Claimants move to amend their claims and answers. Under Federal Rule of Civil Procedure 15, "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2); *see* Fed. R. Civ. P., Supp. R. A(2) (general federal rules apply to forfeiture proceedings except when inconsistent). The Court may deny leave to amend if amendment would be futile. *Sound of Music Co. v. Minn. Mining & Mfg. Co.*, 477 F.3d 910, 922–23 (7th Cir. 2007).

As discussed above, the Court previously struck claimants' claims and answers because claimants had no specific interest in the defendant property and thus lacked

statutory and prudential standing.  Claimants contend that they can now appropriately amend their claims and answers.  They argue that serving the United States Marshal with a citation to discover assets created a lien on the defendant funds effective on the day of service, so that claimants now possess an interest in the defendant funds.  *See* 735 ILCS 5/2-1402(a) & (m).  The government contends that amendment would be futile, because the claimants still lack statutory, prudential, and constitutional standing.

### 1.    Article III standing

"There are two different forms of standing in a forfeiture case such as this: Article III standing and statutory standing.  To contest a forfeiture, a claimant first must demonstrate a sufficient interest in the property to give him Article III standing, otherwise there is no case or controversy."  *United States v. $103,387.27*, 863 F.2d 555, 560 n.10 (7th Cir. 1988) (internal quotation marks omitted).

The government contends that claimants lacked standing at the time they filed their claims because they did not have any interest in the defendant funds, and that they cannot subsequently acquire constitutional standing.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 571 n.4 (1992) ("The existence of federal jurisdiction ordinarily depends on the facts *as they exist when the complaint is filed*." (emphasis in original; internal quotation marks omitted)).  The Court concludes that claimants had Article III standing at the time they filed their claims.

As the Court discussed in its previous decision, a claimant's constitutional standing in a civil forfeiture case depends on three elements:  "(1) an immediate threat of injury; (2) fairly traceable to the [government's] conduct; that (3) a favorable federal court decision likely would redress or remedy."  *United States v. 5 S 351 Tuthill Rd.*, 233

14

F.3d 1017, 1022 (7th Cir. 2000). As a general rule, the standing requirement is "undemanding," and the sorts of claimants who lack standing in this context are those who have experienced "purely psychological harm" or "simple indignation." *Id.* (internal quotation marks omitted). "[W]hile ownership and possession generally may provide evidence of standing, it is the injury to the party seeking standing that remains the ultimate focus." *United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 527 (2d Cir. 1999) (money transmitting companies had standing to contest forfeiture of their customers' funds, because companies were liable to customers to make up any shortfalls).

Claimants must also have statutory standing. Both the civil forfeiture statute and Supplemental Federal Rule of Civil Procedure G require that a claim "state the claimant's interest in [the forfeited] property." 18 U.S.C. § 983(a)(2)(C)(ii); Fed. R. Civ. P., Supp. R. G(5)(i)(B); *see also* 18 U.S.C. § 983(d)(6) (stating that claimant asserting innocent owner defense must have "an ownership interest in the specific property sought to be forfeited" and cannot have "only a general unsecured interest in, or claim against, the property or estate of another"). A claimant must comply with these procedural rules to establish statutory standing. *$103,387.27*, 863 F.2d 555, 560 n.10.

Many reported forfeited cases discuss standing, but it is unclear whether they are discussing the standing requirement that the civil forfeiture statute and rules impose on claimants, or standing under Article III. Some courts have held that an unsecured creditor lacks standing without expressly stating whether they meant statutory or constitutional standing. *E.g.*, *United States v. $20,193.39*, 16 F.3d 344, 346 (9th Cir. 1994); *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 772 F. Supp. 2d 191, 198–99 (D.D.C. 2011). The court in *$20,193.39* discussed the requirements of the

15

civil forfeiture statute while ruling that a claimant lacked standing, suggesting that its decision concerned statutory and not constitutional standing. *$20,193.39*, 16 F.3d at 346. Similarly, the court in *Bank Julius Baer* discussed the requirements of the civil forfeiture statute and rule before stating that claimants who had no specific interest in the defendant property lacked standing. *Bank Julius Baer*, 772 F. Supp. 2d at 198–99. The court also stated that it was not deciding whether the forfeiture standing requirement was statutory or constitutional. It noted that then-Judge Sotomayor had questioned whether forfeiture claimants, who are not invoking federal jurisdiction in the first instance, should even have to demonstrate constitutional standing. *Id.* at 198 n.2 (citing *United States v. $557,933.89, More or Less, in United States Funds*, 287 F.3d 66, 79 n.9 (2d Cir. 2002) (Sotomayor, J.)).

As it did in its motion to strike claimants' original claims and answers, the government cites cases in which it contends that courts have held that general unsecured creditors lack Article III standing in a civil forfeiture case. *See United States v. 5208 Los Franciscos Way*, 385 F.3d 1187, 1191 (9th Cir. 2004); *One-Sixth Share*, 326 F.3d at 41*; United States v. $38,000 in United States Currency*, 816 F.2d 1538, 1543 & n.12 (11th Cir. 1987)*; United States v. Commodity Account No. 549 54930 at Saul Stone & Co.*, No. 96 C 8423, 1999 WL 91910, at *1 (N.D. Ill. Feb. 11, 1999).

One of the cases cited by the government, *One-Sixth Share*, is ambiguous regarding whether its holding is based on constitutional or statutory standing. In that case, the First Circuit stated that constitutional standing required an ownership or possessory interest in the defendant property. *One-Sixth Share*, 326 F.3d at 41. The court, however, cited as its authority an earlier First Circuit case, which itself did not

16

state whether it was addressing constitutional or statutory standing and cited as its support a District of Maryland case that based its decision on the requirements of the forfeiture statute, not the Constitution. *See United States v. One Parcel of Real Property with Bldgs.*, 942 F.2d 74, 78 (1st Cir. 1991); *United States v. Miscellaneous Jewelry*, 667 F. Supp. 232, 235–36 (D. Md. 1987). At another point in its decision, the First Circuit stated that an unsecured creditor lacked standing, without specifically saying constitutional standing. As justification, the court cited the forfeiture statute and the Ninth Circuit decision in *$20,193.39*, which was based on analysis of the forfeiture statute, not the Constitution. *One-Sixth Share*, 326 F.3d at 44; *$20,193.39*, 16 F.3d at 346.

In two of the other cases cited by the government, the courts did not expressly hold that an unsecured creditor lacked Article III standing. In *5208 Los Franciscos Way*, the court stated that Article III standing could be demonstrated by "a colorable interest in the property, for example, by showing actual possession, control, title, or *financial stake*." *5208 Los Franciscos Way*, 385 F.3d at 1191 (emphasis added); *see also United States v. One Lincoln Navigator 1998*, 328 F.3d 1011, 1013 (8th Cir. 2003) (claimant with personal financial stake in defendant property has Article III standing). Because the claimants relied on allegations of ownership, the court did not discuss what might demonstrate a financial stake in the defendant property. Similarly, in *$38,000*, the Eleventh Circuit stated that constitutional standing required a sufficient interest in the property so that the claimant would be injured if the property was forfeited. *$38,000*, 816 F.2d at 1543 & n.12. The court, however, did not state what sort of interests would be insufficient, holding only that ownership or possession was sufficient for Article III

17

standing. *Id.* at 1543–44.

In the final case cited by the government, the court did state, in *dictum*, constitutional standing requires an ownership type interest in the defendant property. *Commodity Account No. 549 54930*, 1999 WL 91910, at *1. That case cited as authority two cases that do not specifically say that an ownership interest is required. First, the court cited a Third Circuit case which stated only that "[c]ourts generally do not deny standing to a claimant who is either the colorable owner of the *res* or who has any colorable interest in it." *United States v. Contents of Accounts Numbers 3034504504 & 144-07143*, 971 F.2d 974, 985 (3d Cir. 1992) (italics in original). Second, the court also cited the Seventh Circuit's decision in *$103,387.27*, which states only that a claimant must have a sufficient interest in the defendant property. *$103,387.27*, 863 F.2d at 650 n.10.

Regardless of the holdings of other courts, the Seventh Circuit has not adopted a stringent standard for constitutional standing in forfeiture cases. In *$103,387.27*, the court stated that a claimant had to have a sufficient interest in the defendant property for constitutional standing, but did not discuss what interests were sufficient. *$103,387.27*, 863 F.2d at 560 n.10. The Seventh Circuit elaborated on the Article III standing requirement for forfeiture claimants in *5 S 351 Tuthill Rd.* There, the court stated that the standing requirement was undemanding and required only that the claimant allege injury, causation, and redressability. *5 S 351 Tuthill Rd.*, 233 F.3d at 1022. The court stated that it disagreed with decisions from other courts that applied a more stringent test for constitutional standing, one that required claimants to show they exercised dominion and control over the defendant property. The court stated that such exacting

18

tests would be more appropriate for determining prudential standing than constitutional standing. *Id.* at 1022–24. The court further stated that the types of injuries that did not confer standing were those that were only "intellectual, psychological, or ideological." *Id.* at 1022. Although the claimant in *5 S 351 Tuthill Rd.* was the beneficiary of a land trust and thus had some manner of ownership interest, the Seventh Circuit stated that his standing arose from the fact that if the property was forfeited, "[h]e will lose the opportunity to receive the proceeds, if and when the land is sold." *Id.* The court held that the claimant had standing even though the land trust gave him no ability to manage, lease, or sell the property within the trust. *Id.* at 1021.

Based upon the Seventh Circuit's decision in *5 S 351 Tuthill Rd.*, the claimants in this case had constitutional standing at the time they filed their initial claims and answers. At that time, claimants had obtained an order of default against Al Qaeda, and only the extent of their damages was uncertain. Therefore, if the government were able to forfeit the defendant funds, claimants would have lost the ability to execute on the funds, which they otherwise certainly would have had once the New York district court determined their damages and issued a final judgment. The lost ability to satisfy the default the claimants had already obtained and the judgment they have now is an injury sufficient to convey standing, similar to the way in which the claimant in *5 S 351 Tuthill Rd.* had standing because he stood to lose the future opportunity to receive proceeds from a land trust. *See also United States v. Premises Known as 7725 Unity Ave.*, 294 F.3d 954, 957 (8th Cir. 2002) (lienholder whose interest was junior to government's forfeiture interest had Article III standing); *United States v. Reckmeyer*, 836 F.2d 200, 205–06 (4th Cir. 1987) (concluding in a criminal forfeiture case that an

unsecured creditor of an individual has an interest in the individual's forfeited property if the government seeks to take title to all the individual's assets)*; United States v. 105,800 Shares of Common Stock of FirstRock Bancorp, Inc.*, 830 F. Supp. 1101, 1116–17 (N.D. Ill. 1993) (option agreement allowing claimant to purchase forfeited stock was sufficient to convey Article III standing even though interest was a mere expectation before option was exercised). Claimants' injury is also clearly caused by the government's forfeiture action and can be redressed by a favorable determination in the current case. Thus claimants satisfy the other requirements for standing.

In sum, claimants had a financial stake in the defendant property at the beginning of this forfeiture case; absent forfeiture, they would have been able to use the property to satisfy the judgment they were sure to receive once their existing default order was reduced to a money judgment. Forfeiture would have injured the claimants in a sufficiently concrete and particular manner, because they would not have been able to execute on the funds. The government's action threatened to cause this injury, and the Court could have redressed the injury. The claimants thus had Article III standing at the time of their initial claims and answers, and they continue to have constitutional standing now.

## B.      Statutory standing

The Court previously held that claimants lacked statutory standing because they had no specific interest in the defendant funds as required by the civil forfeiture statute and the Federal Rules of Civil Procedure. *See* 18 U.S.C. § 983(a)(2)(C)(ii); Fed. R. Civ. P., Supp. R. G(5)(a)(i)(B). The claimants contend that they now have statutory standing, because they acquired a lien on the defendant funds by service of their

citation to discover assets. The government contends that claimants have not established the requisite statutory standing, because the forfeiture process requires the claimants' interest in the funds to have existed prior to the filing of the forfeiture action.

The government's argument is based on several cases from other district courts. One of these cases, *Bank Julius Baer*, held in the alternative that a claimant could not establish standing by obtaining a lien years after the commencement of the forfeiture case. *Bank Julius Baer*, 772 F. Supp. 2d at 202–03. The court based its reasoning on the forfeiture statute's requirement that all claims be filed within thirty days of receiving notice of the government's forfeiture action, suggesting that the claimant's interest had to have existed at the time. *Id.* at 202; *see* 18 U.S.C. § 983(a)(4)(A). The court also noted that a claimant could not make use of the statutory innocent owner defense if it acquired an ownership interest after the criminal acts that made the property forfeitable and knew the property was subject to forfeiture. *Bank Julius Baer*, 772 F. Supp. 2d at 203; *see* 18 U.S.C. § 983(d)(3)(A). Two other cases cited by the government reasoned that the relation-back provision of the civil forfeiture statute, under which the government's interest in forfeited property dates to the time of the criminal acts that made the property forfeitable, suggests that any claimant's interest must arise before commencement of the forfeiture proceeding. *United States v. Unit H-310 Apusento Garden*, No. 07-00006, 2011 WL 3715283, at *4 (D. Guam Aug. 24, 2011); *United States v. One 1965 Cessna 320C Twin Engine Airplane*, 715 F. Supp. 808, 811–12 (E.D. Ky. 1989); *see* 18 U.S.C. § 981(f).

The Court notes that contrary to the first point relied on by the court in *Bank Julius Baer*, the Seventh Circuit has allowed claimants to amend their claims when they

lacked statutory standing prior to amendment.  *See $103,387.27*, 863 F.2d at 560–61.

More importantly, the provisions of the TRIA prevent any application of the forfeiture

statute's time limits or relation-back provision.  The TRIA provides that the blocked

assets of a terrorist party shall be subject to execution by judgment holders

notwithstanding any other provision of law.  The time limits in the civil forfeiture statute

and particularly the statute's relation-back provisions would prevent claimants from

executing their judgments under the TRIA, and accordingly the provisions of the TRIA

control.  *See Weinstein*, 609 F.3d at 53 (TRIA controls over contrary provisions).

Another district court has held that, in the criminal forfeiture context, the right of

judgment creditors of a terrorist party to execute their judgments could not be impeded

by the forfeiture process and its relation-back provision.  *See United States v. Holy Land*

*Found. for Relief & Dev.*, No. 3:04-CR-0240-P, 2011 WL 3703333 (N.D. Tex. Aug. 19,

2011).  The court recognized, as have others, that the TRIA was enacted to counter

executive branch resistance to the judgment creditors of terrorists collecting on their

judgments and to provide more compensation for the victims of terrorism.  *Id.* at *3–4,

*6.  It also noted that the purpose of the relation-back provisions of the criminal

forfeiture statute is to prevent improper transfers of forfeitable property.  The court

reasoned that allowing judgment holders to execute on terrorist property would "in fact,

further the purpose of the relation-back doctrine by ensuring the terrorist organization's

property is in the hands of the victims themselves instead of the hands of the criminal."

*Id.* at *6.  The court also stated that the TRIA's notwithstanding provision "is

unambiguous and effectively supersedes all conflicting laws."  *Id.* at *6.  Although the

court acknowledged that the TRIA might have been primarily intended to counter

various immunity defenses protecting the assets of terrorist states, it stated that the TRIA applies more broadly to all terrorist parties, not just terrorist states, and that its broad language also applies to preempt provisions of the criminal forfeiture statute. *Id.*

The Court agrees with the court in *Holy Land* and concludes that the TRIA's notwithstanding provision similarly overcomes any barriers that the civil forfeiture statute imposes on claimants' efforts to amend now that they have established an interest in the defendant funds. Although courts have concluded that the TRIA imposes no obligation on the United States to maintain blocked funds, thus suggesting that the statute does not prevent the government from initiating a forfeiture action against blocked funds, those same courts recognized that the TRIA effectively supersedes all laws with which it actually conflicts. *Smith*, 346 F.3d at 271; *see Smith v. Federal Reserve Bank of New York*, 280 F. Supp. 2d 314, 319–20 (S.D.N.Y. 2003). To the extent that the civil forfeiture statute prevents claimants from executing as they are entitled to do under the TRIA, the TRIA's provisions supersede the civil forfeiture statute. Accordingly, plaintiffs have statutory standing.

## C. Prudential standing

In its previous decision, the Court concluded that claimants lacked prudential standing because they had no specific interest in the defendant property and could not satisfy the definition of "innocent owner" contained in the forfeiture statute. That definition requires a claimant to be a bona fide purchaser for value who reasonably not know that the property is subject to forfeiture. 18 U.S.C. § 983(d).

The government contends that claimants still lack prudential standing because they cannot qualify as innocent owners. The government argues that claimants did not

acquire their lien on the defendant property for value and, because they had already participated in the forfeiture process before obtaining their lien, they certainly knew the property was subject to forfeiture.

"[P]rudential standing . . . embodies judicially self-imposed limits on the exercise of federal jurisdiction." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) (internal quotation marks omitted). The courts have not defined the limits of prudential standing, but it "encompasses . . . the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Id.* at 12 (internal quotation marks omitted). In its previous decision, the Court tentatively adopted the reasoning of cases that have concluded that because the civil forfeiture statute contains specific protections for innocent owners, only innocent owners are within the zone of interests protected by the civil forfeiture statute. 18 U.S.C. § 983(d); *e.g.*, *$500,000.00*, 591 F.3d at 404. Other cases, however, have held that whether a claimant is an innocent owner is a merits issue and should not affect whether a claimant has standing. *See United States v. One 1990 Beechcraft*, 619 F.3d 1275 n.3 (11th Cir. 2010) (statutory definition of ownership does not affect standing but instead is an element of merits); *One Lincoln Navigator 1998*, 328 F.3d at 1014 ("Although many cases refer to [the definition of owner] as part of the standing inquiry, it is in fact an element of the innocent owner's claim on the merits." (internal quotation marks omitted)). In addition, the Seventh Circuit has stated that "[t]he legislative history of forfeiture law indicates that a rather expansive zone of interests in protected by the innocent owner provision." *5 S 351 Tuthill Rd.*, 233 F.3d at 1023.

Given the conflicting out-of-circuit case law and the Seventh Circuit's holding in *5*

*S 351 Tuthill Rd.*, the Court doubts whether a claimant who has statutory standing because it possesses a specific interest in the defendant property could be considered to lack prudential standing on the ground that it does not qualify as an innocent owner. Moreover, if claimants are not within the zone of interests protected by the civil forfeiture statute, they are certainly within the zone of interests protected by the TRIA and have prudential standing to raise claims under that statute. As discussed above, the TRIA's notwithstanding provision supersedes conflicting law. Thus to the extent that claimants lack prudential standing under the civil forfeiture statute, Congress's clear intent via the TRIA to allow them to execute on their judgments overcomes any uncertainty regarding their ability to file a claim under the civil forfeiture statute.

In sum, claimants do not lack Article III, statutory, or prudential standing to raise claims in a civil forfeiture proceeding, and their proposed amendment is thus not futile.

## Conclusion

For the reasons stated above, the Court denies the government's motion to quash [case no. 12 C 1346, 13] and grants the claimants' motion to amend [case no. 11 C 4175, docket no. 77]. The case is set for a status hearing on October 2, 2012 at 9:30 a.m. to set a schedule for further proceedings.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: September 25, 2012