UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>ALL FUNDS ON DEPOSIT WITH R.J. O'BRIEN & ASSOCIATES, HELD IN THE NAME OF BRIDGE INVESTMENT, S.L., BEARING ACCOUNT NUMBERS XXX-X3931 AND XXX-X1784, MAINTAINED AT HARRIS BANK, ACCOUNT NUMBER XXX-171-6,<br><br>　　　　Defendant<br><br>VIGILANT INSURANCE COMPANY; CHUBB CUSTOM INSURANCE COMPANY; CHUBB INDEMNITY INSURANCE COMPANY; FEDERAL INSURANCE COMPANY; CHUBB INSURANCE COMPANY OF NEW JERSEY; CHUBB INSURANCE COMPANY OF CANADA; PACIFIC INDEMNITY COMPANY; AND GREAT NORTHERN INSURANCE COMPANY; AMERICAN ALTERNATIVE INSURANCE COMPANY; THE PRINCETON EXCESS & SURPLUS LINES INSURANCE COMPANY; AND GREAT LAKES UK INSURANCE COMPANY; AND ONEBEACON INSURANCE GROUP<br><br>　　　　Claimants | No. 11 C 4175<br><br>Judge Matthew F. Kennelly |

## CLAIMANTS' AMENDED ANSWERS TO PLAINTIFF'S
## FIRST SET OF INTERROGATORIES

INTERROGATORY NO. 1:

　　Identify the date upon which the claimants first became aware of the existence of the defendant funds.

ANSWER:　　Objection. Claimants object to this interrogatory on the grounds that it seeks information protected from disclosure by the attorney-client privilege and work product doctrine. By way of further answer, all information in Claimants' possession concerning the existence of the defendant funds and their relationship

to al Qaeda was conveyed to Claimants by their counsel, and discovered by counsel as a result of their ongoing investigation on behalf of Claimants in support of the claims asserted in the multi-district litigation proceeding *In Re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (S.D.N.Y.).

Without waiving and subject to the foregoing objections, Claimants first became aware of the existence of the defendant funds, and the relationship of al Tayyeb and al Qaeda to those funds, on June 21, 2011, through a newspaper article published in the Chicago Tribune on that date, entitled *Al-Qaida Operative Invested With Chicago Brokerage House in 2005*. Claimants have produced a copy of that article in response to Plaintiff's First Request for Production of Documents.

INTERROGATORY NO. 2:

Identify the means by which the claimants first became aware of the existence of the defendant funds.

ANSWER: Objection. Claimants object to this interrogatory on the grounds that it seeks information protected from disclosure by the attorney-client privilege and work product doctrine. By way of further answer, all information in Claimants' possession concerning the existence of the defendant funds and their relationship to al Qaeda was conveyed to Claimants by their counsel, and discovered by counsel as a result of their ongoing investigation on behalf of Claimants in support of the claims asserted in the multi-district litigation proceeding *In Re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (S.D.N.Y.).

Without waiving and subject to the foregoing objections, Claimants first became aware of the existence of the defendant funds, and the relationship of al Tayyeb and al Qaeda to those funds, on June 21, 2011, through a newspaper article published in the Chicago Tribune on that date, entitled *Al-Qaida Operative Invested With Chicago Brokerage House in 2005*. Claimants have produced a copy of that article in response to Plaintiff's First Request for Production of Documents.

INTERROGATORY NO. 3:

Identify the date upon which the claimants first became aware of the existence of Bridge Investment, S.L.

ANSWER: Objection. Claimants object to this interrogatory on the grounds that it seeks information protected from disclosure by the attorney-client privilege and work product doctrine. By way of further answer, all information in Claimants' possession concerning the existence of the defendant funds and their relationship to al Qaeda was conveyed to Claimants by their counsel, and discovered by counsel as a result of their ongoing investigation on behalf of Claimants in

support of the claims asserted in the multi-district litigation proceeding *In Re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (S.D.N.Y.).

Without waiving and subject to the foregoing objections, Claimants first became aware of the existence of Bridge Investment, S.L. on June 21, 2011, through a newspaper article published in the Chicago Tribune on that date, entitled *Al-Qaida Operative Invested With Chicago Brokerage House in 2005*. Claimants have produced a copy of that article in response to Plaintiff's First Request for Production of Documents.

INTERROGATORY NO. 4

Identify the means by which the claimants first became aware of the existence of Bridge Investment, S.L.

ANSWER: Objection. Claimants object to this interrogatory on the grounds that it seeks information protected from disclosure by the attorney-client privilege and work product doctrine. By way of further answer, all information in Claimants' possession concerning the existence of the defendant funds and their relationship to al Qaeda was conveyed to Claimants by their counsel, and discovered by counsel as a result of their ongoing investigation on behalf of Claimants in support of the claims asserted in the multi-district litigation proceeding *In Re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (S.D.N.Y.).

Without waiving and subject to the foregoing objections, Claimants first became aware of the existence of Bridge Investment, S.L. on June 21, 2011, through a newspaper article published in the Chicago Tribune on that date, entitled *Al-Qaida Operative Invested With Chicago Brokerage House in 2005*. Claimants have produced a copy of that article in response to Plaintiff's First Request for Production of Documents.

INTERROGATORY NO. 5:

Identify the date upon which the claimants first became aware of al Tayyeb's connection to al-Qaeda.

ANSWER: Objection. Claimants object to this interrogatory on the grounds that it seeks information protected from disclosure by the attorney-client privilege and work product doctrine. By way of further answer, all information in Claimants' possession concerning al Tayyeb's connection to al Qaeda was conveyed to Claimants by their counsel, and discovered by counsel as a result of their ongoing investigation on behalf of Claimants in support of the claims asserted in the multi-district litigation proceeding *In Re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (S.D.N.Y.).

Without waiving and subject to the foregoing objections, Claimants first became aware of al Tayyeb's connection to al Qaeda on June 21, 2011, through a

3

newspaper article published in the Chicago Tribune on that date, entitled *Al-Qaida Operative Invested With Chicago Brokerage House in 2005*. Claimants have produced a copy of that article in response to Plaintiff's First Request for Production of Documents.

INTERROGATORY NO. 6:

Identify the means by which the claimants first became aware of al Tayyeb's connection to al-Qaeda.

ANSWER: Objection. Claimants object to this interrogatory on the grounds that it seeks information protected from disclosure by the attorney-client privilege and work product doctrine. By way of further answer, all information in Claimants' possession concerning al Tayyeb's connection to al Qaeda was conveyed to Claimants by their counsel, and discovered by counsel as a result of their ongoing investigation on behalf of Claimants in support of the claims asserted in the multi-district litigation proceeding *In Re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (S.D.N.Y.).

Without waiving and subject to the foregoing objections, Claimants first became aware of al Tayyeb's connection to al Qaeda on June 21, 2011, through a newspaper article published in the Chicago Tribune on that date, entitled *Al-Qaida Operative Invested With Chicago Brokerage House in 2005*. Claimants have produced a copy of that article in response to Plaintiff's First Request for Production of Documents.

INTERROGATORY NO. 7:

Identify any and all actions taken by the claimants to identify assets and/or property belonging to al Tayyeb prior to June 19, 2011.

ANSWER: Objection. Claimants object to this interrogatory on the grounds that it seeks information protected from disclosure by the attorney-client privilege and work product doctrine. Without waiving and subject to the foregoing objection, Claimants respond as follows.

Beginning even before the filing of their lawsuit against al Qaeda and its alleged material sponsors and supporters in 2003, and continuing through the present date, Claimants' have undertaken extensive and ongoing efforts through their counsel to identify assets of al Qaeda and its affiliates, that might provide a potential source of compensation to Claimants for the injuries suffered as a result of the September 11th Attacks. That ongoing initiative has included efforts to identify assets that have been blocked by the United States pursuant to various sanctions programs administered by the Treasury Department's Office of Foreign Assets Control, including assets associated with the al Qaeda terrorist network. To that end, Claimants' counsel have reviewed each *Terrorist Asset Report* issued by the Office of Foreign Assets Control for the calendar years 2002 through 2011.

As OFAC has explained and acknowledged in the context of those reports, "Section 304 of Public Law 102.138, as amended by Public Law 103.236 (22 U.S.C. §2656g) (hereinafter referred to as Section 304 (Tab 1), requires the Secretary of the Treasury in consultation with the Attorney General and appropriate investigative agencies, to provide an annual report to the Congress concerning the nature and extent of assets held in the United States by terrorism-supported countries and organizations engaged in international terrorism." *See Terrorist Assets Report – Calendar Year 2011,* Office of Foreign Assets Control, U.S. Department of the Treasury, at p. 2.

For purposes of compiling the *Terrorist Assets Report*, the Treasury Department polls various agencies of the federal government, including the Department of Justice. *Id.* at Tab 2. In regards to the content and scope of the information included in the Report, the Treasury Department has explained "The blocked asset amounts described [in the report] represent amounts frozen under U.S. sanctions programs that block all property and interests in property of designated or blocked parties in the United States or in the possession or control of a U.S. person (or, in the case of Cuba, a person subject to U.S. jurisdiction). The term 'interest' is broadly defined in OFAC's sanctions regulations in Chapter V of Title 31 of the Code of Federal Regulations. An interest in property may be direct or indirect and includes property interests short of full ownership. In many instances, the interest may partial or contingent…*Because the blocked assets discussed in this report include assets not actually owned by designated or blocked parties, they are described throughout as assets "relating to" a designated party.*" *Id.* at p. 1.

As set forth in further detail below, Claimants submitted numerous FOIA requests to relevant agencies of the federal government in an effort to obtain information concerning the nature and extent of assets blocked by the United States, to include blocked assets generally identified in the annual *Terrorist Assets Report*. These included requests for information concerning al Qaeda blocked assets. Given the Office of Foreign Assets Control's own definition of "al Qaeda assets" in the report, the requests reasonably encompassed blocked assets that, in the view of the United States, were not technically "owned" by al Qaeda, but for which there was some direct or indirect relationship to al Qaeda. Thus, the FOIA requests and related efforts undertaken by Claimants to obtain information concerning blocked al Qaeda assets were calculated to obtain information relating to blocked assets of al Qaeda members, to include al Tayyeb. The Treasury Department consistently opposed disclosure of such information to Claimants and other plaintiffs in the September 11th MDL.

For further details concerning Claimants' efforts to develop information concerning assets of al Qaeda and its affiliates, and positions adopted by the United States in relation to such efforts, Claimants refer Plaintiff to the Answers to Interrogatory Nos. 8 and 9 below.

5

INTERROGATORY NO. 8:

      Identify any and all actions taken by the claimants to identify assets and/or property belonging to al-Qaeda prior to June 19, 2011.

ANSWER:    Objection: Claimants object to this interrogatory on the grounds that it seeks information protected from disclosure by the attorney-client privilege and work product doctrine. Without waiving and subject to the foregoing objection, Claimants respond as follows.

        On September 10, 2003, Claimants, along with several other insurance companies, filed suit in the United States District Court for the Southern District of New York seeking reimbursement for losses incurred as a result of the September 11, 2001 terrorist attacks. That action, *Federal Insurance Co. v. Al Qaida*, Case No. 03-cv-6978 (S.D.N.Y.), asserts claims against the al Qaeda terrorist organization, senior members of al Qaeda, key financiers of the terror group, banking and financial institutions that knowingly provided financial services to al Qaeda members, and other entities (such as Islamic charities) that played a critical role in the terrorist organization's financial support network.

        Even prior to the commencement of that lawsuit, Claimants proactively initiated a number of efforts to locate and identify monies, properties, investments, business interests, and other assets belonging to al Qaeda and individuals and entities around the globe that conspired to aid al Qaeda's global jihad against the United States and the West. Knowing that the United States, United Nations, foreign governments, and other international bodies were conducting investigations concerning the financial and material support provided to Osama bin Laden and al Qaeda in the years prior to and after the September 11th attacks, Claimants have undertaken diligent and vigorous efforts to request and obtain asset and/or property information belonging to al Qaeda and its terror network, including but not limited to, Freedom of Information Act (FOIA) requests, Requests for International Judicial Assistance (Letters Rogatory), subpoenas, and formal discovery demands in the September 11th litigation.

        The United States has generally opposed Claimants' requests for disclosure of such information, to include requests seeking to identify blocked assets of al Qaeda and its affiliates. Nevertheless, Claimants provide the following summary of their efforts over the past ten years:

1.     <u>Freedom of Information Act Requests</u>

On behalf of Claimants and several other insurance companies, Cozen O'Connor submitted Freedom of Information Act ("FOIA") requests to a number of United States government agencies on July 30, 2003, seeking, in relevant part: "(D) Identification of assets belonging to (i) State Sponsors of Terrorism; (ii) Foreign Terrorist Organizations; and (ii) Executive Order 13224 designees identified in Schedules A, B and C respectively, attached hereto." Those requests seek not

6

only the identification of assets and/or property specific to the al Qaeda terrorist entity and Osama bin Laden himself, but further extends to 192 entities and individuals designated by the U.S. Department of the Treasury, including the following: Ayman al Zawahiri, Abu Zubaydah, Khalid Sheikh Muhammad, Ramzi Bin al Shibh, Wa'el Hamza Jelaidan, Yassin al Kadi, Rabita Trust, Al Haramain Islamic Foundation, Benevolence International Foundation, Egyptian Islamic Jihad, Lashkar e Tayyiba, Jemaah Islamiya, Abu Sayyef Group, and Bank al Taqwa.

One of the U.S. government agencies receiving the July 30, 2003 FOIA request from Claimants included the Department of Justice (DOJ). That request remained outstanding for many years until the DOJ transmitted a February 27, 2008 letter to Cozen O'Connor, apologizing for the delay in processing the July 2003 request, and further inquiring as to whether the firm remained interested in pursuing the request. After a number of subsequent telephone conferences with DOJ representatives discussing same, Cozen O'Connor submitted an amended FOIA request to the DOJ on June 16, 2008. The amended request specifically sought "any and all documents from the DOJ's Criminal Division identifying assets belonging to the foreign states, terrorism-related entities and individuals, and FTOs identified in Schedule D." Schedule D identified a group of twenty designated defendants in the September 11th MDL, including al Qaeda.

By letter dated October 21, 2008, Rena Y. Kim, Chief of the FOIA office for the DOJ-Criminal Division, advised Cozen O'Connor that the Criminal Division's Asset Forfeiture and Money Laundering Section ("AFMLS") conducted a search of its database and that "as of August 5, 2008, the AFMLS has reported that they do not have any records of assets pertaining to the individuals and entities named in your request." The October 2008 communication was a full year after OFAC had blocked the two R.J. O'Brien Bridge Investment accounts totaling $6,226,355.00 – yet those al Qaeda-related funds (under the name of Mohammed Qasim al Ghamdi) were not disclosed by the DOJ-Criminal Division. Additionally, searches of the AFMLS database reportedly did not produce results for other Executive Order 13224 designees identified in the Schedule D, including Al Haramain Islamic Foundation, International Islamic Relief Organization (IIRO), Abd al Hamid Sulaiman al Mujil, Wa'el Jelaidan, Aqeel al Aqeel, Soliman al Buthe, Rabita Trust, and Yassin al Kadi – all of which were designated well before 2008.

Efforts to obtain al Qaeda asset and/or property information from the U.S. Department of the Treasury (DOT) via the July 2003 FOIA request, including information contained in the Office of Foreign Assets Control's (OFAC) database of blocked assets, were opposed by the United States. For several years following submission of that request, Cozen O'Connor expended significant time and resources to secure responsive documentation and information from the DOT. However, as a result of significant and ongoing deficiencies in the DOT's responses, as well as an overall unwillingness to provide the blocked asset information, Cozen O'Connor initiated suit against the DOT in 2005. *Cozen*

7

*O'Connor v. Department of Treasury*, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 05-CV-4332. Cozen O'Connor actively litigated the DOT's opposition to disclosure of the requested information regarding al Qaeda and related parties, but the DOT continued to oppose disclosure of those materials, claiming that the documentation was properly exempted from production pursuant to FOIA Exemptions 4 and 7(D). By letter dated October 27, 2006, the DOT represented that it had identified 75 pages that were responsive to the request for information contained in OFAC's aggregate database of blocked assets, but that the blocked asset information was exempt from disclosure pursuant to 5 U.S.C. § 552(b)(4); (b)(7)(D). The DOT produced the 75 pages bearing Bates numbers 000366-440 with redactions for all references to the blocked asset information contained in the OFAC database, including the asset name, holder and account number. Claimants are attaching a copy of the October 27, 2006 letter and the documents attached to the letter in further response to Plaintiff's First Set of Interrogatories. In connection with its defense of the FOIA suit, the DOT also produced a summary list of the exemptions asserted and *Vaughn* Indices for the material processed by the Treasury and withheld in full or in part. These documents reflect that the DOT maintained its position concerning the applicability of the exemptions as to the requests for blocked asset information. Claimants are attaching a copy of the summary list and the *Vaughn* Indices in further response to Plaintiff's First Set of Interrogatories. Ultimately, Cozen O'Connor was unsuccessful in efforts to obtain the blocked asset information. For further details regarding the litigation, Claimants direct Plaintiff to the docket in that case, and note that the Department of Justice represented the DOT in those proceedings. Accordingly, the United States government is already in possession of this information.

Claimants' July 30, 2003 FOIA requests seeking the identification of assets and/or property specific to the al Qaeda terrorist organization were similarly sent to the Department of State, Defense Intelligence Agency, Department of Defense (Pentagon), Department of Homeland Security, Federal Bureau of Investigation, National Security Agency, Central Intelligence Agency, and Defense Security Office. None of these agencies has produced documentation or information providing details concerning any particular blocked al Qaeda assets.

In the years since the commencement of the September 11th MDL, Claimants have submitted a number of additional FOIA requests to these very same government agencies seeking information regarding al Qaeda-related defendants in the 9/11 litigation, to include documents and evidence relating to bank accounts, assets, and other financial data. For example, FOIA requests were submitted to several agencies seeking documents relating to publicly identified senior al Qaeda members Mohammad Jamal Khalifa, Khalid Sheikh Mohammed, and Abu Zubaydah. Claimants similarly submitted FOIA requests seeking information relating to certain foreign terrorist organizations operating under the al Qaeda umbrella, including but not limited to, Abu Sayyaf Group, Moro Islamic Liberation Front, Jemaah Islamiya, and the Moro National Liberation Front. Moreover, FOIA requests have been submitted to the above agencies requesting

information for each of the Islamic charities that are alleged to have played a critical role in transferring financial and other support to al Qaeda in the years leading up to the September 11th attacks – Muslim World League (MWL), International Islamic Relief Organization (IIRO), Al Haramain Islamic Foundation, World Assembly of Muslim Youth (WAMY), Saudi High Commission (SHC), Saudi Joint Relief Committee for Kosovo and Chechnya (SJRC), Saudi Red Crescent Society (SRC), Rabita Trust, Muwafaq Foundation, Third World Relief Agency (TWRA), and Benevolence International Foundation (BIF). Moreover, Claimants have submitted FOIA requests to the Department of State, Central Intelligence Agency, Department of Treasury, Defense Intelligence Agency, Department of Justice and others seeking intelligence reports and memoranda identified in the Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission"). Those requests were calculated to adduce various forms of evidence and information, including information concerning the existence and location of any particular blocked al Qaeda-related assets. Despite these diligent efforts, Claimants have been unable to secure information identifying blocked assets and/or property associated with al Qaeda via the FOIA process.

2. <u>Requests for International Judicial Assistance (Letters Rogatory)</u>

Following the September 11th attacks, multiple global investigations concerning the financial and material support provided to the al Qaeda terrorist organization have been conducted by various international bodies and foreign governments. On behalf of all plaintiffs in the September 11th MDL, Claimants and members of the PEC have made diligent efforts to request and obtain relevant asset information via the Letters Rogatory process since the commencement of the 9/11 litigation. For instance, in 2002 and 2003, plaintiffs transmitted Requests for International Judicial Assistance to the judicial authorities of several foreign countries – Spain, Belgium, Bosnia-Herzegovina, Italy, and Morocco – seeking documents, testimony, and other evidence collected by authorities investigating individuals and entities for their role in providing extensive financial and material support to al Qaeda. The Letters Rogatory have specifically requested relevant banking and financial records.

More recently, plaintiffs transmitted a Request for International Judicial Assistance to the International Criminal Tribunal for the Former Yugoslavia (ICTY) on July 13, 2009. The Letter Rogatory specifically sought documents, testimony, evidence, and other materials relating to: (i) the sources of financial, logistical, or other material support for the mujahideen and/or al Qaeda, both during and after the Former Yugoslavia conflicts; (ii) the banking and financial activities of the purported Islamic charities or dawah organizations implicated in the sponsorship of the mujahideen or al Qaeda; (iii) the involvement of any banks or financial institutions in channeling financial or other resources to the mujahideen or al Qaeda; (iv) the involvement of Wa'el Hamza Jelaidan and Yassin al Kadi in the support or sponsorship of the mujahideen and/or al Qaeda; and (v) al Qaeda's prominent financiers identified on the "Golden Chain." The

9

Letters Rogatory have not yielded any information identifying the defendant funds or other specific blocked assets associated with al Qaeda.

3.  Subpoenas

From 2004-2008, Claimants and members of the PEC served approximately twenty-four subpoenas on various financial institutions seeking bank account records and other financial information relating to al Qaeda, Osama bin Laden, senior al Qaeda members, prominent al Qaeda financiers, and other al Qaeda-related individuals and entities designated by OFAC pursuant to Executive Order 13224. In particular, Claimants and members of the PEC have served subpoenas on the following: CitiBank FSB; Riggs Bank; J.P. Morgan Chase & Co.; American Express Bank; Mashreqbank; Habib Bank; Deutsche Bank Trust Company Americas; Walmart Corporate Headquarters; Sportsman Markets; Habib American Bank; BB&T Corporation; UBS AG; SunTrust Banks, Inc.; Bank of America Corporation; Raffeisen Bank; Western Union Financial Services, Inc.; ABN-AMRO Inc.; TD Banknorth; and First Union National Bank. The subpoenas have not yielded any information identifying the defendant funds or other specific blocked assets associated with al Qaeda.

4.  Requests for Production of Documents

Claimants and members of the PEC have additionally served jurisdictional and merits discovery on a variety of defendants appearing in the litigation, including but not limited to the following – Prince Sultan Bin Abdulaziz Al Saud; Prince Salman Bin Abdulaziz Al Saud; Prince Naif Bin Abdulaziz Al Saud; Prince Turki Al Faisal Al Saud; Prince Mohammed Al Faisal Al Saud; Wa'el Hamza Jelaidan; Adel Batterjee; MWL; IIRO; Rabita Trust; WAMY-International; WAMY-Saudi Arabia; Al Haramain; Dubai Islamic Bank; Sana-Bell, Inc./Sanabel al Kheer; SAAR Network Individuals and Entities; Jamal Barzinji; Saudi Binladen Group; National Commercial Bank; Tarik Hamdi; Khalid bin Mahfouz; Yassin al Kadi; Abdulrahman bin Mahfouz; Yousef Jameel; Yeslam bin Laden; Bakr bin Laden; Perouz Sedaghaty; Soliman al Buthe; Sulaiman al Rajhi; Saleh al Rajhi; Abdullah al Rajhi; Dallah Avco Trans Arabia; Abdul Aziz al Ibrahim; and Sami Omar al Hussayan. Those document requests specifically sought asset information, including banking and financial records, investment records, property records (commercial and residential), and ownership interests in business entities in the United States and abroad. The requests for production of documents have not yielded any information identifying the defendant funds or other specific blocked assets associated with al Qaeda.

INTERROGATORY NO. 9:

Identify any and all actions taken by the claimants to attach, place a lien, and/or otherwise encumber alleged assets and/or property of al-Qaeda prior to June 19, 2011.

ANSWER: Objection: Claimants object to this interrogatory on the grounds that it seeks information protected from disclosure by the attorney-client privilege and work product doctrine. Without waiving and subject to the foregoing objection, Claimants respond as follows:

As set forth above in Claimants' response to Interrogatory No. 8, Claimants undertook vigorous and extensive efforts to identify assets and/or property belonging to al Qaeda. Despite their best attempts to do so, those efforts did not produce information identifying the defendant funds or other specific blocked assets associated with al Qaeda. Also as part of their efforts to identify and attach al Qaeda-related assets, Claimants and other insurance company plaintiffs moved for entry of default judgment against al Qaeda and other parties on September 29, 2005 in the September 11th MDL. On April 7, 2006, the Honorable Richard C. Casey entered defaults as to liability against al Qaeda and in favor of Claimants. On February 13, 2007, Claimants and other plaintiffs in the *Federal Insurance* action filed a Motion for Assessment of Damages Against Defaulting Defendants, through which they sought to reduce the defaults to default judgments against al Qaeda.

On March 22, 2007, Judge Casey died, and on April 25, 2007, the Chief Judge for the Southern District of New York assigned the September 11th MDL to the Honorable George C. Daniels. At the time of the transfer, approximately one hundred Rule 12 motions to dismiss were fully briefed and awaiting action by the court. On May 29, 2007, the September 11th MDL Plaintiffs' Executive Committees ("PEC") and its Defendants' Executive Committee ("DEC") submitted status reports at the Court's request, and they advised the Court that the motion to assess damages was ready for disposition. The PEC reminded the Court of the pendency of that motion during a hearing on June 26, 2007 and in correspondence directed to Judge Daniels on August 1 and August 7, 2007.

Over the next three years, however, Judge Daniels ruled on only two motions to dismiss and conducted only four case management conferences, and took no action on the motion to assess damages. On June 3, 2010, the September 11th MDL plaintiffs reluctantly filed an Emergency Petition for a Writ of Mandamus, asking that the Second Circuit either order Judge Daniels to surrender the case or direct that the Southern District of New York transfer the matter to another judge. Two weeks later, on June 17, 2010, Judge Daniels issued a sixty-page order disposing of the majority of the pending Rule 12 motions to dismiss. On September 13, 2010, Judge Daniels issued another decision disposing of the remaining pre-discovery motions to dismiss. However, those rulings failed to mention the motion to assess damages.

By letter dated May 27, 2011, the PEC again advised Judge Daniels that "Judge Casey entered default judgments as to liability against al Qaeda" in 2006 and explained that "[p]laintiffs urgently need to have at least certain of their default judgments against al Qaeda reduced to a monetary sum," noting specifically the potential that further delays could prejudice their interests in blocked al Qaeda

11

funds. The letter further noted that the pending motion to assess damages was accompanied by "detailed affidavit testimony" specifying the insurance company plaintiffs' damages, and that the entry of judgment in an amount certain "will not require significant investment of the Court's time and resources." It concluded:

> At this time, the undersigned co-chairs of the Plaintiffs' Executive Committees respectfully request that the Court take up consideration of the *Federal Insurance* Plaintiffs' Motion for Assessment of Damages, *but only insofar as it relates to the al Qaeda terrorist organization itself.* While many of the claims asserted in this litigation have been fiercely contested, Plaintiffs respectfully submit that no party would disagree that the September 11th Plaintiffs are entitled to a judgment against al Qaeda. Any monetary judgment entered against al Qaeda in favor of the *Federal Insurance* Plaintiffs will be used to advance and protect the interest of all plaintiffs in the MDL.

In a separate letter to Judge Daniels on June 1, 2011, the PEC submitted a copy of the most recent Terrorist Assets Report prepared by the Treasury Department's Office of Foreign Assets Control ("OFAC"). This "verifie[d] that OFAC has frozen in excess of $13,000,000 in al Qaeda assets." The June 1, 2011 letter also noted that "[p]ursuant to § 201 of the Terrorism Risk Insurance Act, those frozen assets are available to satisfy a judgment against al Qaeda."

The United States government filed the Verified Complaint for Forfeiture *less than three weeks later* on June 19, 2011, and gave notice of its forfeiture by website publication. The notice made no mention of al Qaeda, Mohammad Qasim al Ghamdi, or Muhammad Abdallah Abdan al Ghamdi (a/k/a Abu al Tayyeb). Despite its knowledge of Claimants' five-year old default, the long-pending motion to assess damages against al Qaeda, and the 9/11 plaintiffs' numerous FOIA requests seeking information concerning blocked assets of al Qaeda and its associates, the United States did not provide any direct notice to any of the Claimants, other 9/11 plaintiffs, or their counsel. In fact, Claimants were apprised of the filing of the forfeiture proceeding and al Qaeda's relationship to the targeted funds only as a result of a June 21, 2011 newspaper article in the Chicago Tribune, reporting the details of the Government's Verified Complaint.

On July 13, 2011, Judge Daniels referred the Motion for Assessment of Damages to Magistrate Judge Frank Maas for a damages inquest. On October 14, 2011, Magistrate Judge Maas issued a Report and Recommendation concerning the Motion for Assessment of Damages, through which he recommended that judgment be entered in favor of Claimants and against al Qaeda for compensatory damages in the aggregate amount of $3,117,272,655.33. In accordance with the mandatory treble damages provisions of the Anti-Terrorism Act, 18 U.S.C. § 2333 *et seq.*, Magistrate Judge Maas further recommended that the compensatory damage award in favor of Claimants and plaintiffs be trebled, and thus

12

recommended a final aggregate award in favor of Claimants and plaintiffs in the amount of $9,351,247,965.99.

On December 16, 2011, Judge Daniels formally adopted the Report and Recommendation in its entirety, and issued an Order that judgment be entered in favor of Claimants and plaintiffs for $9,351,247,965.99. On December 22, 2011, the Clerk of Court of the United States District Court for the Southern District of New York entered judgment in favor of Claimants and plaintiffs and against al Qaeda in accordance with Judge Daniels' December 16, 2011 Order. On January 10, 2012, Judge Daniels issued an Order directing that the judgment in favor of Claimants and plaintiffs and against al Qaeda be made final pursuant to Fed. R. Civ. P. 54(b). On January 25, 2012, the Clerk of Court of the United States District Court for the Southern District of New York entered final judgment in favor of Claimants and plaintiffs and against al Qaeda in accordance with Judge Daniels' January 10, 2012 Order.

Following the expiration of the thirty day appeal period, Claimants registered their judgment in the Northern District of Illinois on February 27, 2012. Beginning on March 13, 2012, Claimants took steps to establish liens against the defendant funds on the basis of the registered final judgments and filed a Praecipe for Writ of Execution in accordance with the Court's procedures. In view of the delays attendant to the issuance and service of the Writ of Execution, Claimants also initiated parallel efforts to perfect the liens against the defendant funds through the filing of a Notice of Citation to Discover Assets on April 6, 2012, again in accordance with this Court's procedures. Claimants made service upon the judgment debtor pursuant to 735 ISLS § 1402(b). Additionally, Claimants served a Citation to Discover Assets on the U.S. Marshals Service on April 6, 2012. On April 10, 2012, the Courtroom Deputy entered a minute entry before Judge Gettleman ordering the Writ of Execution to issue. Claimants' lien against the defendant funds was perfected as of the date of service of the Citation to Discover Assets.

INTERROGATORY NO. 10:

Identify any and all actions taken by the claimants to enforce any and all judgments obtained in the In re Terrorist Attacks litigation.

ANSWER: Objection. Claimants object on the grounds that this interrogatory seeks information that is not relevant to any claim or defense at issue, and is overly broad. Efforts undertaken by Claimants to enforce any judgments outside the context of the present litigation are not relevant to the determination of Claimants' entitlement to execute upon the defendant funds. Claimants have fully described their efforts to obtain judgment against al Qaeda, to identify assets of al Qaeda and its associates, and to perfect their lien against the defendant funds and execute upon those funds in answers 7-9 above. Those answers provide all relevant information responsive to this interrogatory. Claimants further object to this

interrogatory on the grounds that it seeks information protected from disclosure by the attorney-client privilege and work product doctrine.

                COZEN O'CONNOR

                BY: _____
                      Sean P. Carter, Esquire
                      Attorney for Claimants

14

## DECLARATION

I, Sean P. Carter, do hereby declare, certify and verify, under penalty of perjury as provided by federal law, that I am the attorney for Claimants, and thereby authorized to answer these interrogatories on behalf of the claimants (1) Vigilant Insurance Company, Chubb Custom Insurance Company, Chubb Indemnity Insurance Company, Federal Insurance Company, Chubb Insurance Company of New Jersey, Chubb Insurance Company of Canada, Pacific Indemnity Company, and Great Northern Insurance Company; (2) American Alternative Insurance Company, the Princeton Excess & Surplus Lines Insurance Company, and Great Lakes UK Insurance Company; and (3) OneBeacon Insurance Group; and that I have read the foregoing Answers to Plaintiff's First Set of Interrogatories, and that every answer is true and correct.

Executed on March 14, 2013 in
Philadelphia, Pennsylvania.

_____
Sean P. Carter, Esquire
Attorney for Claimants

## **CERTIFICATE OF SERVICE**

I, Sean P. Carter, attorney for Claimants, hereby certify that on this 14th day of March, 2013, I did serve a true and correct copy of Claimants' Answers to Plaintiff's First Set of Interrogatories via e-mail to the individual listed below:

Joel Hammerman, Esquire
Assistant United States Attorney
219 South Dearborn
Room 500
Chicago, IL  60604
joel.hammerman@usdoj.gov

_____
Sean P. Carter, Esquire
Attorney for Claimants

LEGAL\15543670\1
03/26/2013