# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 11 C 4175 |
| | ) | |
| ALL FUNDS ON DEPOSIT WITH R.J. | ) | |
| O'BRIEN & ASSOCIATES, HELD IN THE | ) | |
| NAME OF BRIDGE INVESTMENT, S.L., | ) | |
| BEARING ACCOUNT NUMBERS XXX- | ) | |
| X3931 AND XXX-X1784, MAINTAINED AT | ) | |
| HARRIS BANK, ACCOUNT NUMBER XXX- | ) | |
| 171-6, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

The United States filed an *in rem* action seeking forfeiture of about $6.7 million

held in futures trading accounts and belonging to an affiliate of the Al Qaeda terrorist

organization. Several insurance companies that paid billions of dollars on their

insureds' property damage claims arising from the September 11, 2001 terrorist attacks

then filed verified claims to the funds, along with answers to the government's

complaint. The Court first granted the government's motion to strike claimants' claims

and answers. Claimants, having registered a judgment against Al Qaeda in this district,

then served a citation to discover assets on the United States Marshal and obtained a

writ of execution from another judge in this district. The Court subsequently granted

claimants' motion to amend their claims and denied the government's motion to quash

the writ of execution.  Both the government and claimants then moved for summary judgment.  The Court granted claimants' motion and denied the government's motion.  The Court then issued a judgment order, finding claimants substantially prevailed and were entitled to attorney's fees.

Claimants have now moved for an award of attorney's fees and costs.  For the reasons stated below, the Court grants the claimants' motion but reduces the requested award.

## Background

The Court assumes familiarity with the facts of this case from its earlier decisions.  In 2005, insurance companies filed suit against Al Qaeda in the Southern District of New York seeking reimbursement for their losses from the terrorist attacks of September 11, 2001.  The companies received an order of default in April 2006, but the court did not issue an order specifying a damages award until December 2011.  That amount was $9,351,247,965.99.  The court entered a final judgment in January 2012.

In 2005, an individual named Mohammad Qasim al Ghamdi took control of a commodities futures trading account at R.J. O'Brien & Associates (RJO), a Chicago company.  The account had been opened two years earlier in the name of Bridge Investment, S.L.  The funds belonged to Muhammad Abdallah Abdan Al Ghamdi, a member of Al Qaeda also known as Abu Al Tayyeb.  In June 2007, the United States Department of the Treasury's Office of Foreign Assets Control (OFAC) blocked the two RJO accounts in question.  Four years later, on June 19, 2011, the United States filed a verified complaint in this Court for forfeiture of the funds, an action *in rem* under 18 U.S.C. § 981(a)(1)(G)(i) and (iv), the civil forfeiture statute.

On June 21, 2011, the *Chicago Tribune* published an article about the government's decision to block the RJO/Al Ghamdi accounts.  The article served as the first notice about the funds for the insurance companies that had obtained the order of default against Al Qaeda in the Southern District of New York.  In August 2011, the insurance companies filed in the forfeiture action verified claims to the RJO / Al Ghamdi funds.  After briefing and argument, the Court granted the government's motions to strike the claims in March 2012.  *See United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, No. 11 C 4175, 2012 WL 1032904 (N.D. Ill. Mar. 27, 2012).  The Court did not decide whether claimants had constitutional standing, but it granted the government's motion to strike and denied claimants' motion to amend their claims on the ground that they lacked statutory and prudential standing.

Claimants registered their judgment against Al Qaeda in this district on February 27, 2012, and the matter was assigned to Judge Gettleman.  They sought a writ of execution in that matter on March 13, 2012 and filed a notice of citation to discover assets on April 6.  Four days later, Judge Gettleman ordered issuance of a writ of execution.  The matter was later transferred to this Court's docket.  In September 2012, this Court denied the government's motion to quash the writ and granted claimants' motion to amend their claims to reflect the entry of final judgment in the Al Qaeda litigation.  *See United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 892 F. Supp. 2d 1038 (N.D. Ill. 2012).  Among other issues, the Court concluded that the claimants had both prudential and statutory standing based on their interest in the defendant property.  Both sides thereafter moved for summary judgment.  The Court granted summary judgment to claimants and denied summary judgment to the

government.  The Court found that claimants had constitutional, statutory, and prudential standing and that sovereign immunity did not preclude them from asserting their interest in the defendant funds.  *See United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, No. 11 C 4175, 2013 WL 5567562 (N.D. Ill Oct. 9, 2013).

The Court issued a judgment order in this case in November 2013.  The order stated that "[c]laimants have substantially prevailed in this litigation and therefore are entitled to reasonable attorney fees and other litigation costs reasonably incurred as well as pre- and post-judgment interest pursuant to the provisions of 28 U.S.C. § 2465(b)."  Nov. 13, 2013 Judgment Order at 2, Case No. 11 C 4175 [docket no. 162].  Claimants filed the present motion for fees and costs in December 2013.

## Discussion

The United States is liable for "reasonable attorney fees and other litigation costs reasonably incurred by the claimant" in "any civil proceeding to forfeit property under any provision of Federal law in which the claimant substantially prevails."  28 U.S.C. § 2465(b)(1)(A).  In general, "[m]ultiple equitable factors govern the crafting of an attorneys' fees award, so district courts have wide discretion to determine what constitutes reasonable attorneys' fees."  *Serafinn v. Local 722, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 597 F.3d 908, 919 (7th Cir. 2010) (internal alterations and quotation marks omitted).

In their initial memorandum, Claimants request $345,347.50 in fees and $7155.19 in costs for a total of $352,502.69, which they reduced to $341,535.62 after making concessions following the government's filing of its response brief.  The government argues that claimants' original total request should be reduced by $194,893

4

and that claimants' requested hourly rates should also be reduced. The government challenges the fees and costs claimants incurred at a time when the government contends their claims were insufficient as a matter of law, as well as fees that the government argues relate to other cases. The government also argues that claimants are not entitled to certain of their travel expenses related to this litigation or fees for clerical (as opposed to legal) work that claimants' paralegals performed. Finally, the government argues that certain of claimants' attorneys' discrete tasks are not compensable and that the requested hourly rates for claimants' attorneys should be reduced by twenty percent.

**A.      Fees for work prior to claimants' citation to discover assets**

The government argues that the Court should deny $142,757.40 in claimants' requested fees and costs because they were incurred before April 10, 2012—a time when, the government argues, claimants' claim to the funds was "hopelessly deficient" and "insufficient as a matter of law." Gov't Resp. at 8. This argument is based on the fact that claimants did not obtain a writ of execution against the defendant funds until that date, shortly before which they received a judgment in a New York federal case against al Qaeda and registered the judgment in this district. Claimants respond that they originally stated their interest in the defendant funds in June 2011 and that they deserve compensation for work performed from that date through their successful motion for summary judgment. They contend that their efforts prior obtaining the writ of execution preserved their interest in the funds, advanced their claim to the funds, expedited proceedings, provided research and argument for later proceedings, and helped them prevail on several issues. They also argue that the cases the government

cites for its argument are distinguishable, because they deal with parties who simultaneously make successful and unsuccessful claims, rather than those who pursue a single claim.

The Supreme Court has observed that a "fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. . . . The result is what matters." *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983). At the same time, if "a plaintiff has achieved only partial or limited success," a district court may find plaintiff's counsel's lodestar to "be an excessive amount" and eliminate specific hours or reduce the overall award "to account for the limited success." *Id.* at 436–37. There is "no precise rule or formula" for doing so. *Id.* at 436. Courts are to differentiate "winning and losing claims [that] are just different legal theories in support of the same relief" from "losing claims seeking different or additional relief, or damages against different defendants." *Richardson v. City of Chicago*, 740 F.3d 1099, 1103 (7th Cir. 2014). In the former category, "full compensation is proper"; in the latter, the judge can calculate the time "devoted to the winning claims, had no clunkers been presented" or otherwise "make an across-the-board reduction that seems appropriate in light of the ratio between winning and losing claims." *Id.* This is "a highly contextual and fact-specific enterprise," and "[p]recision is impossible in such calculations," but "the district court must justify its decision." *Sottoriva v. Claps*, 617 F.3d 971, 975–76 (7th Cir. 2010).

The Court originally struck claimants' claim in March 2012 because they did not have the requisite interest in the specific funds at issue. In its March 2012 order, the Court noted that claimants had no security interest or lien on the defendant funds, which

6

precluded statutory standing to pursue those funds. The Court also denied claimants' motion to amend their claims, noting in particular that they had not served a citation to discover assets on the government, which would have created a lien on the funds in question and given them an interest in the property. Claimants subsequently served such a citation. Thereafter, the service of this citation and claimants' acquisition of a writ of execution prompted this Court to find that claimants had statutory standing, deny the government's motion to quash claimants' claims, and grant claimants' motion to amend their claim and answers.

In short, claimants filed a claim to the defendant funds, and they were eventually successful on that claim. They did not bring multiple claims to the funds based on different theories, only one of which was successful, the sort of situation contemplated in the cases cited above and in the government's brief. In other words, there is no "losing claim" in this case. *See Richardson*, 740 F.3d at 1103. The government argues that claimants presented two "temporally distinct" claims "based on different facts." Gov't Resp. at 9. But the claim that claimants brought and the claim they won on summary judgment were one and the same. Though it is true that the Court originally struck claimants' claim, it permitted claimants to amend the claim under Rule 15(a).

The government's contention that an initial setback on an ultimately successful claim precludes a fee award for that party's initial work presents a novel legal theory. Taken to its logical endpoint, it would entitle a prevailing party to attorney's fees only for work it performed on the latest, successful version of its complaint. Any of the initial preparation, research, strategizing, and investigation a party performed prior to its filing of its latest amended complaint would be lost time. This result would withhold funds

from parties, like claimants here, for the entirety of their work on a successful claim. The government also characterizes claimants' research efforts prior to their citation to discover assets as "pre-litigation/pre-interest fee-shifting" that is not permitted by Section 2465. Gov't Resp. at 9. Yet the work claimants performed on their claim after they filed it cannot be called "pre-litigation" with a straight face.

The government further contends in general that compensating claimants for their work on the case prior to filing their citation to discover assets is not reasonable under 28 U.S.C. § 2465(b)(1)(A). Yet claimants' earlier efforts in the case led to the Court's issuance of a decision that was helpful to them. Although the Court struck their claims in March 2012, the Court's opinion made it clear what it would take for claimants to obtain the requisite interest in the defendant funds. It noted that the claimants at that time "lack[ed] the requisite interest in the property that is the subject of the forfeiture action." *All Funds on Deposit with R.J. O'Brien & Assocs.*, 2012 WL 1032904, at *8. "In particular," the Court said, claimants had "not served citations to discover assets, which, under Illinois law, would create a lien on the defendant property and thus give them an interest in the property. *See* 735 ILCS 5/2-1402(a), (m)." *Id.* As noted above, claimants did serve such a citation two weeks later, and one day after that, they filed their ultimately successful motion to amend their claims. In short, claimants' efforts prior to their filing of the citation were part of the chain of events establishing their interest in the defendant funds and eventually prevailing on summary judgment. The Court concludes this work was reasonable and therefore properly compensable under section 2465(b)(1)(A).

The cases the government cites do not require a different result. They feature

situations in which plaintiffs brought multiple claims against defendants, only one or some of which were successful.  The government cites this Court's decision in *Wells v. City of Chicago*, 925 F. Supp. 2d 1036, 1042 (N.D. Ill. 2013), where the Court reduced the requested fee award "given plaintiff's partial and limited success."  Yet in that case, as claimants point out, the plaintiff had two claims and lost one of them.  The Court observed that "a good deal of the fees and expenses were incurred only because" the plaintiff's medical care claim, which she lost, "was part of the case."  *Id.* at 1043.  Although the plaintiff contended that all ninety of the depositions she took were reasonably related to her winning claim (unlawful detention), the Court concluded that this argument "strain[ed] credulity past the breaking point" because the majority of the depositions concerned the losing claim.  *Id.*  Because of these and other factors, the Court ordered an overall reduction of the plaintiff's compensable hours by three-fourths.  Unlike *Wells*, claimants in the present case have not experienced "partial" or "limited" success; they have achieved complete and total success on their sole claim to the defendant funds.  The fact that their claims were initially stricken does not change this fact.  *Wells* does not govern this case.

The government also cites *United States v. One Star Class Sloop Sailboat*, 546 F.3d 26 (1st Cir. 2008).  Although the government cites this case only for the general proposition that courts may disallow time spent in litigating failed claims, the facts of the case are also distinguishable from those under review here.  In that case, one of the winning lawyers "had prevailed on only one issue . . . and had failed on others to which he had quixotically dedicated time and resources."  *Id.* at 39.  Furthermore, the attorney had ultimately recovered far less than the amount he sought

throughout the litigation. Here, by contrast, claimants achieved total success on their only claim. And in *Jaffee v. Redmond*, 142 F.3d 409, 414 (7th Cir. 1998), which the government also cites, the Seventh Circuit reversed the district court's decision to deny fees to an attorney on the ground that a particular argument "did not 'contribute to' her ultimately successful claim." In this regard, the court noted that "an unsuccessful but reasonable argument in support of a successful claim may be compensable." *Id.* This does not help the government's position; indeed, it may help claimants. Even were the Court to agree that claimants' earlier activity in the case somehow constituted a distinct, unsuccessful claim, it was still "in support of" claimants' ultimate success.

The government also cites policy concerns, contending that section 2465(b)(1)(A) was intended to relieve rightful property owners of the burden of litigating the return of their property. Because claimants were not rightful owners before April 10, 2012, the government argues, they do not deserve fees for work prior to that date. This is a variation of the government's other arguments on this question, and it ignores the fact that the Court has decided that claimants are rightful owners of the defendant funds. They have pursued their claim to a favorable resolution.

Finally, in a footnote, the government argues that even if the Court finds that claimants' work on the case prior to the citation is compensable, the Court "could—and should—still deny or reduce the fees prematurely incurred." Gov't Resp. at 11 n.9. The government provides no direct rationale for this argument and no suggestions for the amount by which the Court should reduce the amount sought. Instead, it provides a citation to an unreported California district court case quoting the Ninth Circuit for the notion that a court may reduce a party's hours of they are inadequately documented, if

the case was overstaffed with duplicated hours, or if the hours were "excessive or otherwise unnecessary." *See United States v. One 2008 Toyota RAV 4 Sports Utility Vehicle*, No. 2:09-cv-05672-SVW-PJW, 2012 WL 5272281, at *4 (C.D. Cal. Oct. 18, 2012). The government does not list particular pre-citation tasks that it contends were excessive, duplicated, or inadequately documented. In short, this argument gives the Court no basis to reduce claimants' requested fees and costs.

The Court concludes that claimants are entitled to the reasonable fees and costs they incurred prior serving to their citation to discover assets.

**B.     Work outside this case**

The government contends that 28 U.S.C. § 2465(b)(1)(A) allows recovery of fees only for a forfeiture proceeding. It argues that claimants request fees from cases outside their forfeiture action and that these are not compensable. These include *In re Terrorist Attacks*, 03-MDL-1570 (S.D.N.Y. Mar. 10, 2003), a case that claimants pursued to a judgment in their favor in the Southern District of New York, as well as the judgment enforcement action they filed in this district, *Art Ins. Co. v. Al Qaeda*, No. 12 C 1346. The government supplies a chart in its brief listing the hours to which it objects. It contends that because section 2465 presents only a "narrow exception" to the government's sovereign immunity, only work performed on the forfeiture proceeding itself can be compensated under the statute. Gov't Resp. at 11. Each entry on the government's chart includes notes stating why the government objects to the specific entry. Some of these entries concern meetings of claimants' counsel with the Plaintiffs' Executive Committee (PEC) in the *In re Terrorist Attacks* litigation. The government argues that "[s]trategy meetings of that committee do not constitute actions taken in

furtherance of pursuing the defendant funds in the forfeiture action and are therefore not compensable under 28 U.S.C. § 2465." *Id.* at 14.

In response, claimants concede that some of the hours to which the government objects were for other matters, including the judgment enforcement action, and they have withdrawn requests for 23.6 of these hours, worth $4525. The other hours on the government's chart, claimants contend, are valid. Some were "incurred in connection with reporting on the forfeiture action to the Plaintiff's Executive Committee," where "lawyers from several of the PEC firms performed substantive work in support of Claimants' forfeiture claims." Cls.' Repl. at 8. Claimants argue they did not ask for fees for the work of those lawyers, but they contend that time spent discussing research with those lawyers is compensable, because the research involved "the core legal issues and motions in the forfeiture proceeding." *Id.* at 8–9. Further, claimants contend, the government sought a copy of a confidential agreement among the MDL plaintiffs, which required discussion among PEC members. As for the remaining hours, claimants acknowledge that some were for research performed for the enforcement action, but they argue this research "became relevant to the forfeiture action in 2013." *Id.* at 9. They point to the Court's statement that the enforcement and forfeiture actions have become intertwined; they also argue that the government acknowledges the research in question was relevant to the forfeiture action in 2013. *Id.* Other time, claimants argue, was relevant to both actions because the work it represents was "undertaken in furtherance of and applied equally to both claims." *Id.*

Claimants do not, however, offer defenses for each individual entry on the government's chart—essentially leaving it to the Court to figure out which hourly entries

on the chart apply to each defensive argument claimants make.  Some of these entries

do appear to correspond to claimants' explanations, but others do not.  As the Court

determines, 10.38 hours listed on the chart, worth $5314.17, do not correspond to any

of claimants' arguments listed above.[1]  Without any explanation from claimants about

what these hours had to do with this litigation, the Court concludes that these hours

should be excluded from the fee award.

The remaining hours on the chart seem to fall into a few categories.  First, there

are hours spent researching topics for related litigation that was also used in this

litigation.  Second, there are hours seemingly spent on the judgment enforcement

action; claimants say they excised requests for work in that case, but it looks like they

missed some.  There are also hours spent on consulting with the PEC and / or co-

plaintiffs in the *In re Terrorist Attacks* case, which claimants argue are compensable in

this action, as noted above.  Finally, there are hours that seem to have been spent

directly on the *In re Terrorist Attacks* case, such as "Call w/clerk for Judge Daniels in

---

[1] The entries are as follows:
- 8/8/11, $1625 (2.5 hours at $650/hour):  "Review claim and damage information on file to assemble information necessary for verified claims for Allstate, AXA, Onebeacon & Munich Re."  (Sean P. Carter)
- 8/9/11, $3315 (5.1 hours at $650/hour):  "Draft, revise and edit verified claims for Allstate, AXA, OneBeacon, Munich and calls with clients."  (Sean P. Carter)
- 2/8/12, $225 (1.8 of 2.4 hours at $125/hour—one-fourth of this entry appears compensable):  "Look for native file of Exhibit JJJJ; create zip file and submit via email to Lindsay Francis.  Correct address for Stephen Miller in Chicago Action.  Locate and send briefs to Carter."  (Coleen Williams)
- 2/22/12, $116.67 (0.93 of 1.4 hours at $125/hour—one-third of this entry appears compensable):  "Organize cases for Sean Carter's argument file re 2/24/12 argument in Chicago.  Deliver Koehler hard drive to Steve Heitz and discussion on tasks to be done re same. Discuss Koehler hard drive with Heitz, Tarbutton and Adler."  (Coleen Williams)
- 10/8/12, $32.50 (.05 of .1 hours at $650/hour—one-half of this entry appears compensable):  "Talk with S. Cozen about appellate strategy in CA2 and Chicago strategy."  (Stephen Miller)

SDNY re: Form of Judgment against Al Qaeda and urgency in light of the NDIL forfeiture procedure."  Gov't Resp. at 14 (entry of December 20, 2012).  Neither side advances any legal arguments as to why these hours should or should not be compensable; in fact, claimants cite no legal authority at all, and the government cites only section 2465.  Therefore, the Court is left to assess the general reasonableness of the requested hours.

First, considering claimants' argument that the research of their co-plaintiffs' counsel in the *In re Terrorist Attacks* case was used in the forfeiture action, the Court concludes that claimants' time spent consulting with those attorneys on matters related to this case is compensable.  In claimants' telling, the research those attorneys produced was used in this action, and claimants learned about it through discussions with those attorneys.  They now seek compensation for the time spent on those talks.  Second, time spent on research that claimants used both in the enforcement action and in the forfeiture action should be compensable here; the research in question was done when both actions were pending.  Claimants should not be penalized for using the same research in both cases, and the government presents no legal principle that would prevent claimants from billing for research they used in this case.  However, work that appears to have been exclusively for the judgment enforcement action, or exclusively for the *In re Terrorist Attacks* litigation, is not appropriately compensable in this case.  It is true that both cases related to and in some cases prompted claimants' actions in the forfeiture case.  But with regard to certain entries, claimants cannot say that work done exclusively for the other cases was work done indirectly for the forfeiture case too.

These entries account for 9.7 hours, worth $3312.50.[2]

Finally, the government makes one more argument on a time entry that claimants do not address—that a $394.57 travel charge by attorney Sean Carter was not related to this litigation. The spreadsheet entry for this charge that claimants have submitted bears no explanation for what this travel was for, aside from "Meeting with CTS Consultants" in Chicago. Without any explanation from claimants, the Court concludes this time is not appropriately compensable in this case.

## C.    Attorney travel to Chicago

The government's next set of arguments concerns the travel claimants' attorneys

---

[2] The entries are as follows:
- 12/20/11, $130 (0.2 hours at $650/hour):  "Call with Clerk for Judge Daniels in the SDNY re: Form of Judgment against Al Qaeda and urgency in light of the NDIL forfeiture procedure."  (Sean P. Carter)
- 12/20/2011, $130 (0.2 hours at $650/hour):  "Call w/clerk for Judge Daniels in SDNY re: form of judgments against al Qaeda and urgency in light of ND IL forfeiture proceeding."  (Sean P. Carter)
- 12/28/11, $262.50 (0.7 hours at $375/hour):  "Exchange of correspondence with Sean Carter and Kevin Caraher in our Chicago office and review of the Department of Justice's pleadings to determine the proper venue for registering our judgment against al Qaeda."  (Richard C. Bennett)
- 4/11/12, $630 (2.1 of 2.8 hours at $300/hour—one-fourth of this entry appears compensable):  "Follow up with efforts to perfect lien with Chicago court, and gather and organize various documents supporting efforts to perfect lien, as well as arguments associated with motion to file amended pleadings; coordinate filing of motion to amend."  (Abby Sher)
- 7/13/12, $360 (1.2 hours at $300/hour):  "Revise and finalize reply to response to motion to strike in advance of filing."  (Abby Sher)
- 10/4/12, $600 (2 hours at $300/hour):  "Prepare OFAC application for release of funds."  (Abby Sher)
- 10/8/12, $390 (0.6 hours at $650/hour):  "Review and edit motion to extend Chicago proceeding."  (Sean P. Carter)
- 10/8/12, $360 (1.2 hours at $300/hour):  "Prepare OFAC application for release of funds."  (Abby Sher)
- 10/17/12, $450 (1.5 hours at $300/hour):  "Review and analyze allegations in petition for purposes of addressing connections between funds and al Qaeda." (Abby Sher)

undertook as they came to and from Chicago from Pennsylvania for several hearings. The government contends that some of these hearings were "routine" and "ministerial" and thus did not require claimants' "most expensive counsel" to attend, because local counsel or a telephone conference could have been utilized.  Gov't Resp. at 19–21. The government points to docket entries for various status hearings and concludes that "counsel traveled to Chicago for the following four hearings that the government submits were unnecessary."  *Id.* at 21.  The government also identifies other "more substantive hearings" for which "[i]t was appropriate for the claimants' chosen counsel to travel to Chicago."  *Id.* at 22.  The government contends, however, that claimants' counsel should have been doing work while in transit, which would have cut the chargeable time:  "Surely counsel could have read the parties' briefs and the cases cited in those briefs while in transit."  *Id.* at 22.  As for occasions when it appears claimants' counsel did do work during travel, the government says the tasks performed were "*de minimis*" and likewise should not be compensated.  *Id.* at 22–23.

In calculating an award of attorney fees, "travel time and expenses are compensable."  *Stark v. PPM Am., Inc.*, 354 F.3d 666, 674 (7th Cir. 2004).  However, "if the travel is unnecessary the time spent in travel should be subtracted out."  *Henry v. Webermeier*, 738 F.2d 188, 194 (7th Cir. 1984).  On the government's first point, the Court does not agree that any of the hearings it scheduled in this case were "unnecessary."  Further, the docket entries the government reproduces in its brief do not detail what occurred (or did not occur) at each hearing.  *E.g.*, Gov't Resp. at 21 (Minute Entry for November 20, 2012 [docket no. 104]:  "MINUTE entry before Honorable Matthew F. Kennelly:  Status hearing held and continued to 12/7/2012 at

16

09:30 AM.").  Another entry the government provides actually cuts against its position, because it states that the Court relayed at the hearing an oral decision on the government's motion for forfeiture.  *See id.* (Minute entry for October 18, 2012 [docket no. 99]).  That was a hearing for which claimants' primary counsel appropriately needed and wanted to be present.  The government has not produced transcripts or excerpts of any of the hearings.  Based on the Court's recollection and notes, however, the Court cannot agree with the government's contention that nothing of substance happened at any of these hearings.  The hearings may appear to be "ministerial," but that is so only in hindsight.  Claimants' counsel attended by phone when the Court permitted it, but they otherwise appeared in person.[3]

On the government's argument that claimants' attorneys should have been doing work for this case on their flights to and from Chicago, the government presents no authority that requires that level of attorney "efficiency" in order for time to be compensable.  The Seventh Circuit's statement that "travel time and expenses are compensable" contains no such caveats.  *Stark*, 354 F3d at 674.  Claimants contend that airplane seats are too narrow for them to handle "binders of voluminous cases and developing legal strategy on board."  Cls.' Repl. at 11.  Some might reasonably dispute this in the age of laptops and iPads.  But the Court has enough experience attempting

---

[3] The case the government cites to support its argument on this point is distinguishable, to put it mildly.  *See Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*, 264 F. Supp. 2d 753 (S.D. Ind. 2003).  In that case, the court noted that the attorneys requesting fees traveled "in style," buying first-class plane tickets for several trips and renting luxury cars.  *Id.* at 762.  The issue with the travel in the case was entirely different from those presented here:  "Absent some unusual circumstances not identified by Lilly here, it is not reasonable to shift to the opposing party the costs of first class air travel, luxury cars, or even unreasonably high charges for less luxurious models."  *Id.* at 762.  The government makes no similar complaints about the quality of claimants' attorneys' travel arrangements.

to work in airports and airplanes that it can safely say that claimants' position on this point is reasonable and that the government's argument does not provide a basis for reduction of the fee request. There is also no authority requiring attorneys to use the most up-to-date and most compact technology in order to be compensated for their time under a fee-shifting statute. Claimants also make an even more compelling argument— that planning to perform this work while in transit would have been far too risky given the vagaries of air travel. Finally, the implication of the government's argument is that work claimants' attorneys performed in preparing for hearings in this case should have been done the day before or the day of the hearings in question. In practice, this would impose a disadvantage on out-of-town counsel, and it would also impose a kind of subject-matter test on the work an attorney does while in transit. The government offers no authority to support for this argument, and it is without merit.

In general, claimants' counsel's travel time appears reasonable, and the Court determines that their requested hours for travel time are appropriately included in their fee award.

**D.    Clerical work**

The government contends that claimants have requested compensation for their paralegals' clerical work, which they argue is not "sufficiently complex" enough to justify paralegal fees. Gov't Resp. at 24 (quoting *Spegon v. Catholic Bishop of Chi.*, 175 F.3d 544, 553 (7th Cir. 1999)). The government provides a chart of time entries by paralegals that it contends were clerical in nature. In response, claimants concede that they cannot recover paralegal fees for clerical work, and they have withdrawn such requests. Claimants also have submitted their own chart of withdrawn fee requests,

which includes all but two of the paralegal entries the government argues are clerical in nature. These omissions total 1.5 hours of time, for $188. Claimants provide no explanation for why these entries are not clerical in nature; likewise, the government does not say why they *are* clerical, other than including them on a chart with other clerical expenses. The entries are "Email from J. Tarman re: local rule regarding courtesy copy; call to court" and "Draft Notice of Motions; prepare for courier." Gov't Resp. at 25–26 (entries for 10/13/2011 and 1/12/2012). Both of these entries, like others on the list, arguably appear to involve clerical matters. Without argument from claimants to the contrary, the Court concludes these entries are not appropriately compensable.[4]

## E.    Other attorney tasks

The government next contends that several individual entries within claimants' fee request do not merit compensation. The government first argues it was excessive for attorney Richard Bennett to spend 35.4 hours reviewing the parties' initial pleadings before "conducting research and drafting one section of the claimants' response" to the government's motion to dismiss. Gov't Resp. at 29. The government also contends that attorneys Abby Sher and Sean Carter should not be compensated for work on drafting Rule 26(a)(1)(A) initial disclosures even though forfeiture actions are specifically exempted from this requirement, which claimants concede. The government further argues that it is unreasonable to compensate claimants for attorney Kevin Caraher's

---

[4] The government also argues that if the Court finds any of these clerical expenses reasonable, the Court should at least reduce the hourly rate charged for them. Because claimants voluntarily removed most of these entries from their fee request, and because the Court disallows the two entries claimants did not remove, the Court does not need to consider this rate reduction argument.

0.6-hour review of one of claimants' memos considering the fact that he produced no other time entries in the litigation.  The government also points to three further paralegal entries that are unreasonable, all of which claimants have conceded should not be compensable.

Claimants' explanation for Caraher's work in this case is reasonable.  They say Caraher needed the 0.6 hours he used to review court filings before signing them and that he was acting as counsel in Cozen O'Connor's Chicago office.  Thirty-six minutes for this task is reasonable.  As for the work of attorney Bennett, claimants contend that his review of the pleadings also included review of "relevant legal authority," not just the filings in the case.  Cls.' Repl. at 13.  They argue that Bennett "ultimately contributed to Claimants' ability to formulate and develop legal strategy and take positions with regard to the pleading referenced in the time entry, as well as subsequent time entries."  *Id.* The government offers no basis to contradict this contention.  Thirty-five hours of time to read court filings and cases does not seem unreasonable, considering claimants' statements about Bennett's value to the case.  The Court determines that claimants' requests for Caraher's and Bennett's work in this regard are appropriately compensable.

**F.     Hourly rate**

In the final paragraph of its brief, the government contends that claimants' hourly rates are "unreasonably generous," "well in excess of those normally charged in forfeiture actions," and should be reduced by twenty percent.  Gov't Resp. at 30.  It argues that the requested fees are higher than those from other cases that claimants cite, and it question claimants' attorneys' experience in forfeiture matters.  Further, the government says, claimants' attorneys demonstrated their lack of experience in

forfeiture actions by spending three hours of attorney time on drafting unnecessary Rule 26 disclosures.  (As noted above, claimants have withdrawn their fee request for this entry.)

In order to determine a reasonable fee award, district courts use the so-called lodestar method, which means "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley*, 461 U.S. at 433.  Such a reasonable rate "is derived from the market rate for the services rendered." *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 640 (7th Cir. 2011) (internal quotation marks omitted).  The burden to establish such a market rate falls on a fee applicant, and "[t]he best evidence of an attorney's market rate is his or her actual billing rate for similar work." *Johnson v. GDF, Inc.*, 668 F.3d 927, 933 (7th Cir. 2012).  This rate is "presumptively appropriate to use as the market rate." *People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 90 F.3d 1307, 1310 (7th Cir. 1996) (internal quotation marks omitted).  "Only if the court is unable to determine the attorney's true billing rate (because he maintains a contingent fee or public interest practice, for example) should the court look to the next best evidence—the rate charged by lawyers in the community of reasonably comparable skill, experience, and reputation." *Muzikowski v. Paramount Pictures Corp.*, 477 F.3d 899, 909–10 (7th Cir. 2007) (internal alterations and quotation marks omitted).  Once the fee applicant satisfies her burden of showing that her requested rate is reasonable, "the burden shifts to the other party to offer evidence that sets forth a good reason why a lower rate is essential." *Pickett*, 664 F.3d at 640 (internal quotation marks omitted).

Several attorneys from claimants' counsel's firm worked on this case.  Claimants

request $650 per hour for shareholders from the firm, $375 for firm "members," $300 for associates, $125 for staff attorneys, and $125 for paralegals.  In support of these rates, claimants offer the following evidence:  an affidavit from Stephen A. Cozen, chairman of claimants' counsel's firm, discussing the biographies as well as the standard billing rates of those of the firm's attorneys on this matter who charge by the hour rather than on a contingent-fee basis; another from Elaine M. Rinaldi, the firm's chair of strategic planning and growth, who affirms that the requested rates are in line with attorneys of comparable experience in this area; a copy of the Laffey matrix, a chart of hourly rates for attorneys and paralegals in the Washington, D.C. area; and citations to several cases involving fee awards for forfeiture cases, along with one from this district on a 42 U.S.C. § 1983 case.

The government does not question all of this evidence.  It focuses only on the cases claimants cite, contending that "[n]one of the fees referenced . . . are as high as those sought by the claimants here," and questions the expertise of claimants' counsel in September 11-related litigation and forfeiture law, "for which claimants' counsel do not allege any such expertise."  Gov't Resp. at 30–31.  However, the government does not respond to Cozen's affidavit attesting to the hourly rates certain of their attorneys actually charge.  *See* Declaration of Stephen A. Cozen at 2 [docket no. 169-1] (stating "standard billing rate" of firm shareholder Stephen A. Miller as $650); *id.* at 5 (stating "standard billing rate" of firm member Richard C. Bennett as $375); *id.* at 6 (stating "standard billing rate" of firm member Daniel R. Johnson as $375); *id.* at 7 (stating "standard billing rate" of firm associate Abby J. Sher as $300); *id.* (stating "standard billing rate" of firm associate Jordan S. Fox as $300); *id.* at 8 ("The hourly rates for the

attorneys identified above are consistent with the standard billing rates that these attorneys charge for their services in other complex litigation matters involving hourly paying clients, adjusted annually for inflation.").

As the Court has noted, the rates that these attorneys actually charge are "presumptively appropriate" as the market rate for these attorneys' services. *People Who Care*, 90 F.3d at 1310. This rule is "well established." *Muzikowski*, 477 F.3d at 909. Although the government attacks the experience of claimants' counsel in forfeiture matters, it provides no evidence to rebut the reasonableness of the actual charged rates described above. Furthermore, as both parties are well aware, forfeiture actions such as this one are relatively rare; claimants' counsel's alleged lack of experience in such matters thus cannot be determinative of their hourly rates. More broadly, the litigation of this case was roughly comparable to an appeal; it consisted almost entirely of briefing, research, and argument, with little or no discovery. This provides a reasonable benchmark for assessing the reasonableness and comparability of the requested hourly rates. Claimants' attorney Stephen Miller, a shareholder in the firm who normally charges on an hourly basis, focuses his practice on appellate work and bills at the $650 rate that claimants request for him and other shareholders at the law firm. That rate, which Miller actually charges to paying clients, is presumptively appropriate both for Miller and the other shareholders who worked on the case, and the government has provided no contrary evidence. In addition, claimants have established that other attorneys for whom they seek to recover fees actually bill at the hourly rates they are asking for here, and the government offers no support for its argument that the Court should diverge from those rates. These rates likewise provide reasonable benchmarks

that establish the reasonableness of not only those attorneys' rates but those of others with a comparable level of experience.

In addition, the government has not responded to claimants' reference to the Laffey Matrix, which lists rates generally in line with those claimants request here. Although the Seventh Circuit has noted mixed opinion in the legal community on the applicability of the Laffey Matrix to any given case, *see Pickett*, 664 F.3d at 649–51, as has this Court, *see Wells*, 925 F. Supp. 2d at 1040; *Jimenez v. City of Chicago*, No. 09 C 8081, 2012 WL 5512266, at *5–6 (N.D. Ill. Nov. 14, 2012), the government has not contested its inclusion as evidence here. In short, this is not a case where the attorneys for whom compensation is requested have no regular hourly rates and support their proposed rates only with a self-serving statement of reasonableness. Rather, they are proposing rates that are supported by their actual hourly work for paying clients.

For these reasons, the Court concludes that claimants have met their initial burden to establish the market rates for their attorneys, and the government has not sustained its burden to show otherwise. The Court therefore declines the government's invitation to reduce claimants' requested hourly rates by twenty percent.

## Conclusion

For the foregoing reasons, the Court grants in part claimants' motion for attorney's fees and costs [docket no. 168]. Claimants' modified requested fee and cost award request of $341,535.62 should be reduced. The reductions include:

- $5414.17 for various unexplained entries detailed in Section B above
- $3312.50 for tasks related to *In re Terrorist Attacks* and the enforcement action
- $394.57 for attorney Carter's unexplained travel expense

- $188 for unnecessary clerical work

Counsel are directed to confer promptly to quantify the reductions ordered by the Court and are to make a supplemental joint submission in that regard by no later than May 21, 2014. The attorney time for plaintiffs' counsel associated with this additional work will not be compensable, unless the government or its counsel act unreasonably or in a dilatory fashion in connection with the additional work required.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: May 9, 2014